STATE

v.

**LOCAL NO. 2883, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES.**

**No. 81–499–Appeal.**

Supreme Court of Rhode Island.

July 27, 1983.

Vincent J. Piccirilli, Palombo & Piccirilli, Providence, for plaintiff.

Paul M. Giacobbe, Warwick, for defendant.

## OPINION

MURRAY, Justice.

This is a consolidated appeal by Local No. 2883, American Federation of State, County, and Municipal Employees (the union), from orders of the Superior Court denying the union's motion to confirm an August 2, 1978 arbitration award and granting the state's motion to vacate the award. The award had ordered the reinstatement of Dr. John Smith to the position of superintendent of the Dr. Joseph H. Ladd School retroactive to the date of his dismissal, January 25, 1978. The Superior Court vacated the award on the grounds that the dispute was not arbitrable and that the arbitrator's determination was "arbitrary and irrational." For the reasons that follow, we affirm the trial justice.

The dispute arose over the October 5, 1977 suspension and subsequent termination, effective January 25, 1978, of Dr. John Smith from the position of superintendent of the Ladd School. Doctor Smith had served as superintendent of the school since May 1956. In that position, he was responsible for overseeing the educational, recreational, training, and rehabilitation services, as well as the nursing and dental services of the institution. He reported directly to the assistant director for Mental Retardation of the Department of Mental Health, Retardation, and Hospitals.

Sometime in 1976 it became apparent, through complaints by the Rhode Island Association of Retarded Citizens (RIARC) and an employee of the school, that there were serious problems with the operation of the dental-care program at the Ladd School. The Department of Mental Health, Retardation, and Hospitals (MHRH) engaged a consultant, Dr. Joseph P. Falcetti, to evaluate the dental services. He found the dental clinic at the school totally inadequate. He submitted a report on December 13, 1976, detailing numerous criticisms and providing concrete recommendations for change, most of which required immediate attention and implementation.[1]

During the period between December 1976 and September 1977 MHRH set into motion several subcommittees to deal with the problems of the dental clinic. Doctor Smith participated in these activities. However, there was a feeling among the department administration that he did not respond seriously to the necessity for making immediate changes, and did not actively move to implement any of the recommendations contained in the December 1976 report. In August 1977, Dr. Falcetti returned to evaluate the dental services at the Ladd School. He found conditions unimproved since November 1976, and suggested that "[t]he Dental Clinic at the Ladd School is totally nonexistent, and any move to update it should start with a Tabula Roza [*sic*]." On September 2, 1977, MHRH ordered Dr. Smith to close the dental clinic at the Ladd School.

In late September 1977, after reviewing the events leading to the closing of the dental clinic, Dr. Joseph J. Bevilacqua, director of MHRH, met with Dr. Smith.[2] He

---

1. The Ladd School became certified as an Intermediate Care Facility—Mental Retardation (ICF–MR) in 1974. As such, it was entitled to federal funding as long as it complied with federal regulations. The applicable regulations require that an ICF–MR provide comprehensive dental treatment to its residents. Doctor Falcetti's report explicitly stated that the dental

clinic at Ladd School failed to meet ICF standards.

2. Doctor Bevilacqua and other department officials testified that in mid-September 1977 the press reported the closing of the dental clinic. Subsequently, several newspaper stories about conditions at the Ladd School appeared, and

offered Dr. Smith the opportunity either to resign or to take another position. When Dr. Smith refused to relinquish his position, Dr. Bevilacqua placed him on administrative leave, effective October 5, 1977, pending an investigation of the situation at the Ladd School by MHRH.[3]

On January 11, 1978, Dr. Bevilacqua sent a letter to the Governor detailing the findings of the department's investigation of Dr. Smith's responsibility for inadequate dental care at the Ladd School. He concluded that Dr. Smith had defaulted in his responsibility to assure the Ladd School residents all the services to which they were entitled and that, consequently, he should be dismissed. On January 24, 1978, Dr. Bevilacqua sent a letter to Dr. Smith informing him of his termination effective January 25, 1978.

The union filed a grievance on Dr. Smith's behalf on October 7, 1977, immediately following his suspension, in accordance with the provisions of the Master Contract between the state and the union. The acting assistant director of employee relations for the state agreed to submit the grievance directly to arbitration. The arbitrator held hearings on May 1, 17, and 23, 1978. There were two issues raised at the arbitration proceeding. The state first raised the issue of whether the arbitrator had jurisdiction to hear the case. The second issue concerned whether the discharge of Dr. Smith was for just cause, and if not, what remedy would be appropriate.

On the issue of substantive arbitrability, the arbitrator found the dispute to be arbitrable. The state had argued that, as superintendent of the Ladd School, Dr. Smith was a managerial and supervisory employee and, as such, not eligible for membership in the collective-bargaining unit. Therefore, it contended, he could not be protected by the provisions of the collective-bargaining agreement. The state relied upon the language of G.L. 1956 (1969 Reenactment) § 36–11–2, as amended by P.L. 1973, ch. 256, § 2, and § 36–11–3, as amended by P.L. 1972, ch. 277, § 1, which, it asserted, prohibited inclusion of supervisory personnel in collective-bargaining agreements as a matter of public policy. The state maintained that Dr. Smith's sole recourse upon dismissal was the appeal procedure provided by the State Merit System, G.L.1956 (1969 Reenactment) chapter 4 of title 36.

The arbitrator agreed with the union that Dr. Smith was protected by the collective-bargaining agreement. He noted that the position of superintendent was explicitly included in the bargaining unit certified by the State Labor Relations Board (the board) on March 23, 1973. He pointed out that the state had raised no objection to submitting the dispute to arbitration and, in fact, had explicitly agreed by a letter of February 6, 1978, to take the matter directly to arbitration. He concluded that there was no express statutory prohibition against including the superintendent of the Ladd School in the bargaining unit. Therefore, he held that under the collective-bargaining agreement, Dr. Smith could elect to proceed under the grievance procedure of the agreement or the appeal procedure of the State Merit System.

On the question of whether Dr. Smith had been dismissed for just cause, the arbitrator, relying upon the evidence and the provisions of the collective-bargaining agreement, concluded that Dr. Smith's failures were not sufficient to warrant the penalty of dismissal. He also ruled that the discharge had been procedurally and contractually improper. Accordingly, he ordered that the discharge be rescinded and that Dr. Smith be restored to his former position and compensated at his regular

---

the situation, in Dr. Bevilacqua's words, "heated up considerably." He noted that there was a great deal of pressure from the public, from RIARC, and from the Governor's office concerning the conditions and inadequacies of the Ladd School.

3. On October 14, 1977, Governor Garrahy appointed a task force to "inquire into the administration and organization of the Dr. Joseph H. Ladd School." This report, referred to as the Cannon Commission Report, was presented to the Governor on January 16, 1978.

rate of pay for any time lost during the period of his suspension and dismissal.

The state filed a motion to vacate the arbitrator's award on August 9, 1978. On August 11, 1978, the union filed a motion to affirm the award.

On September 25, 1981, the trial justice delivered a bench decision vacating the arbitrator's award. The trial justice initially determined that the state had preserved its right to challenge the arbitrability of the dispute by objecting to the jurisdiction of the arbitrator at the arbitration proceedings. The trial justice then proceeded to determine whether or not the dispute was arbitrable. He concluded first that the language of § 36–11–2 prohibits supervisory employees from inclusion in collective-bargaining units. The trial justice next found that the union had failed to prove its assertion that Dr. Smith was a member of the bargaining unit. Finally, the court found that the only remedy available upon dismissal to a state employee with permanent status, like Dr. Smith, is review by the Personnel Appeal Board pursuant to the statutory provisions of the State Merit System. Therefore, the trial justice concluded, the arbitrator had no jurisdiction to hear the matter.

The trial justice then proceeded to review the merits of the award. He concluded that the arbitrator's decision was "irrational" and in "manifest disregard of the contractual provisions." The court entered orders on September 28, 1981, granting the state's motion to vacate the award and denying the union's motion to affirm. The union now appeals from those orders.

The preliminary question before this court is whether the trial justice was correct in his finding that this dispute was not arbitrable. Because we answer this question in the affirmative, we need not reach the issue of whether the award itself was "irrational."

It is well settled in this jurisdiction that if a party objects to substantive arbitrability at the arbitration hearing and then proceeds to arbitration, the party has preserved the issue for later determination by a reviewing court. *Providence Teachers' Union, Local 958—American Federation of Teachers v. Providence School Committee,* R.I., 433 A.2d 202, 204 (1981). Because the issue of whether a dispute is arbitrable concerns a question of law, a reviewing court must decide this question de novo. *Id.* 433 A.2d at 205. It is clear, then, that the question of arbitrability was properly before the Superior Court as it is before this court, since the state preserved the issue by objection at the arbitration proceeding.

The question of arbitrability in this case turns on whether or not Dr. Smith was a member of the bargaining unit and thus entitled to the protection of the collective-bargaining agreement. The state argues that the provisions of § 36–11–2 prohibit a state employee in a supervisory or managerial position from becoming a member of any union. The relevant portion of § 36–11–2 provides:

"Supervisory employees shall not endorse any particular employee organization or, by reason of membership in any such organization show prejudice or discriminate toward any individual employee."

It does not appear to this court that the language of this statute expressly excludes managerial and supervisory employees from the ambit of the State Labor Relations Act. However, as a matter of public policy, we find that Dr. Smith, as a supervisory or managerial employee, is not protected under the act. We base this decision on statutory language as well as on a policy explicitly articulated by the State Labor Relations Board.

An analogy may be drawn to the National Labor Relations Act (NLRA). Section 2(3) expressly excludes supervisors from the definition of employees covered by the act.[4]

---

**4.** Section 2(3) of the NLRA explicitly excludes supervisor from the definition of employee: "The term 'employee' * * * shall not include

* * * any individual employed as a supervisor * * *." 29 U.S.C.A. § 152(3) (1973). The

There is no specific exclusion of managerial employees in the language of the statute. However, the United States Supreme Court has held that it was the intention of Congress to exclude all persons properly defined as "managerial employees" from the ambit of the NLRA. *NLRB v. Bell Aerospace Co., Division of Textron, Inc.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). *See NLRB v. Yeshiva University,* 582 F.2d 686 (2nd Cir.1978), *aff'd,* 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (managerial employees are exempted from the coverage of the act not by explicit statutory language but as a matter of board (NLRB) policy and unanimous court approval).

The Court in both of these cases extensively discussed the policy underlying the exclusion of managers from the NLRA. The Court in *NLRB v. Bell Aerospace Co.* explained that inclusion of managerial employees in bargaining units would create a conflict of interest. These employees help formulate and effectuate the employer's policies. To allow them to be union members would be to "obliterate the line between management and labor." 416 U.S. at 278, 94 S.Ct. at 1764, 40 L.Ed.2d at 145. The Court noted the history of the act that was "intended to protect 'laborers' and 'workers' whose right to organize and bargain collectively had not been recognized by industry, resulting in strikes, strife and unrest. By contrast, there was no similar history with respect to foremen, managers, superintendents or vice presidents." *Id.* at 279, 94 S.Ct. at 1764, 40 L.Ed.2d at 145. Finally, the Court pointed out that allowing unionization of supervisors would deprive employers of the loyal representatives to which they were entitled and that it was important for the efficacy of the collective-bargaining process to maintain a balance of

power. *Id.* at 281, 94 S.Ct. at 1765, 40 L.Ed.2d at 147.

The Court in *NLRB v. Yeshiva University,* 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), reiterated many of the policies articulated in *Bell Aerospace.* The Court indicated that because managerial employees "'formulate and effectuate management policies by expressing and making operative the decisions of their employer'" and because they must "exercise discretion within, or even independently of, established employer policy," they must be "aligned with management." *Id.* at 682–83, 100 S.Ct. at 862, 63 L.Ed.2d at 125–26. Once again the Court stated emphatically that the exemption of supervisors and managers from the act grows out of a concern "[t]hat an employer is entitled to the undivided loyalty of its representatives." *Id.* at 682, 100 S.Ct. at 862, 63 L.Ed.2d at 125.

This court has never had the opportunity to assess the applicability to supervisors and managers of the statutory provisions governing organization of state employees. The State Labor Relations Board, however, in November 1973 issued a policy statement on that very question. The board responded to the state's request that management and supervisory personnel be excluded from any state-employee bargaining unit. The board agreed that these employees should be excluded in order to effectuate the intent of the State Labor Relations Act. That intent, according to the board, was expressed in G.L.1956 (1979 Reenactment) § 28–7–2:

> "Employers and employees have recognized that the peaceable practice and wholesome development of that relationship and interest are materially aided by the general adoption and advancement of the procedure and practice of bargaining collectively as between equals. It is in

term "supervisor" is defined in Section 2(11) as follows:

"any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust

their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S. C.A. § 152(11).

the public interest that equality of bargaining power be established and maintained * * *."

The board noted that allowing state managerial and top-level supervisory personnel to organize and to bargain collectively would "disrupt the functions of state government and would put the state of Rhode Island on an unequal footing as far as equality of bargaining power is concerned."

This policy clearly is similar to and as persuasive as that relied upon by the Court in *Bell Aerospace* and *Yeshiva University*. To allow managers and supervisors to participate in the collective-bargaining process would be to create a conflict of interest. Managers and supervisors are those who carry out and often help formulate the employer's policies. In Rhode Island, under the laws governing organization of state employees, § 36–11–3 provides that "[i]t shall be the responsibility of supervisors at all levels to consider and, commensurate with authority delegated by the head of the state department or agency, to take appropriate action promptly and fairly upon the grievances of their subordinates."[5] It is clear that the Legislature, in enacting these statutes, perceived supervisors to be aligned

with the state as the employer in disputes and grievances of the "rank and file employee." It appears patently implausible that, given the language of these statutes and the articulated labor-relations policy of § 28–7–2, the Legislature also intended supervisors and managers to be able to organize and present grievances in the same manner and within the same bargaining units as their subordinates.

We think the legislative intent and the board policy are clearly articulated and rationally based. The board policy had been in effect for four years prior to Dr. Smith's suspension and subsequent termination. We think the promulgation of this policy corrected the administrative error in the board's March 1973 certification of the Ladd School bargaining unit.[6]

■ Accordingly, we hold that Dr. Smith as superintendent of the Ladd School was unquestionably a supervisory and/or managerial employee.[7] As such, he was not protected under the State Labor Relations Act and could not be a member of a bargaining unit. Therefore, he was not covered by the collective-bargaining agreement between the state and the union and was not enti-

---

**5.** General Laws 1956 (1969 Reenactment) § 36–11–2, as amended by P.L.1973, ch. 256, § 2, also assumes that a supervisor is aligned with the employer. By its language exhorting supervisors not to "endorse any particular employee organization or, by reason of membership in any such organization show prejudice or discriminate toward any individual," it distinguishes the rank-and-file employee from his or her supervisor and protects that employee from discrimination on the part of the employer or supervisor on the basis of union activities.

**6.** It should be noted that after the arbitration proceeding, the board held a hearing on a request by the state for clarification of the Ladd School bargaining unit and specifically corrected its earlier error. On December 11, 1978, the board ruled that the original certification of the Ladd School unit, which included the position of superintendent, was erroneous. The board, relying upon its consideration of job descriptions submitted by the state, found that the position of superintendent was managerial. The board held, consistent with its policy statement of November 1973 and based upon the policy of the State Labor Relations Act, that all

managerial personnel were excluded from the collective-bargaining unit. The board noted that this decision was consistent with the exclusion of such personnel under the NLRA. This decision was affirmed by the Superior Court on April 18, 1980, and no petition for writ of certiorari was filed in this court. Although this decision is not dispositive of the issue before us, it is consistent with the board's and this court's readings of the State Labor Relations Act and its applicability to managers and supervisors like Dr. Smith.

**7.** Doctor Smith's job description required him explicitly to perform supervisory and managerial duties. In general he was required to "plan, organize, coordinate and direct the work" of all staff at the Ladd School. Among other things, he was required to "be responsible for the work of the staff," to "consult with superiors relative to the policies and objectives of the institution," and to "make rules and regulations governing the work of all services of the institution."

tled to utilize the grievance procedure provided therein upon suspension from his position on October 5, 1977, or upon his termination on January 25, 1978. Thus, the arbitrator was incorrect in ruling that this matter was arbitrable and in taking jurisdiction over the dispute. The Superior Court correctly vacated the arbitration award on the basis of lack of substantive arbitrability. We therefore need not reach the question of whether the award was irrational or in manifest disregard of the contract terms.

The union's appeal is denied and dismissed, the orders appealed from are affirmed, and the papers in the case are remanded to the Superior Court.