[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This civil action is a claim for judicial review under G.L.1956 (1993 Reenactment) § 42-35-15 of a Decision and Direction of Election entered by The Rhode Island State Labor Relations Board (hereinafter simply "the Board") on October 22, 1992 pursuant to G.L. 1956 (1986 Reenactment) § 28-9.4-4.
International Brotherhood of Teamsters Local Union 64 (hereinafter "Local 64") filed a Petition for Investigation and Certification of Representatives with the Board on January 16, 1991 asking to be certified as representative of a bargaining unit consisting of seven of the plaintiff's employees in the positions of Director of Development and Modernization, Comptroller, Senior Housing Manager, two Housing Managers, Systems Administrator and Executive Secretary to the Director. The plaintiff objected to the petition on the ground that each employee was in a supervisory, managerial and confidential position under § 28-9.4-2(b)(4). After hearings on November 22, 1991 and May 13 and 18, 1992 the Board issued its Decision and Direction of Election, which ordered that a representation election be held for a bargaining unit consisting of all these employees. At an election held on December 10, 1992 Local 64 was chosen by the employees as their bargaining representative. The Board certified Local 64 on December 15, 1992 as the exclusive representative for the bargaining unit pursuant to § 28-9.4-8.
This action was commenced on January 7, 1993. The Board's record was certified to this Court on January 26, 1993. Briefing was concluded on September 24, 1993. On motion of the plaintiff this matter was assigned to this Justice for decision on March 4, 1994.
This appeal raises two issues regarding the Board's decision. First, the plaintiff claims that the Board applied the wrong legal standard in deciding that certain employees were not supervisory or managerial employees, and therefore not within the exception to the general definition of "Municipal employee" in §28-9.4-2(b). See § 42-35-15(g)(1)(2)(4). Second, the plaintiff further claims that the Board's factual conclusions that each employee was not a supervisory, managerial or confidential employee were clearly erroneous in view of the reliable, probative and substantial evidence on the whole record.See § 42-35-15(g)(5).
I.
Any ambiguity attending the unqualified use of the expression "supervisory employee" in § 28-9.4-2, as amended by P.L.1989, ch. 58, § 1, is definitively clarified by the Opinion of the Supreme Court in State v. Local No. 2883, AmericanFederation of State, County and Municipal Employees,463 A.2d 186 (R.I. 1983). If the General Assembly in 1989 had any misgivings about the 1983 construction of this expression by the Supreme Court, it surely would not have left "supervisory" otherwise undefined in the amendment. It cannot be credibly argued that by 1989 the Local 2883, AFSCME case was not well-known public employee labor relations law in Rhode Island.
In that case the question before the Court was whether or not the superintendent of the Ladd School was excluded from the benefit of a collective bargaining agreement because he was a managerial or supervisory employee of the state. While no statute then expressly excluded managerial and supervisory employees from the benefits of the State Labor Relations Act, the Court held that as a matter of public policy such employees were not protected by the Act.
After a careful analysis of the National Labor Relations Act and pertinent decisions of the United States Supreme Court and consideration of a November 1973 policy statement of the Board, the Court described the rationale for the exclusion as follows:
 "This policy (of the Board) is similar to and as persuasive as that relied upon by the Court in Bell Aerospace and Yeshiva University. To allow managers and supervisors to participate in the collective-bargaining process would be to create a conflict of interest. Managers and supervisors are those who carry out and often help formulate the employer's policies. In Rhode Island, under the laws governing organization of state employees, § 36-11-3 provides that `[i]t shall be the responsibility of supervisors at all levels to consider and, commensurate with authority delegated by the head of the state department or agency, to take appropriate action promptly and fairly upon the grievances of their subordinates.' It is clear that the Legislature, in enacting these statutes, perceived supervisors to be aligned with the state as the employer in disputes and grievances of the `rank and file employee.' It appears patently implausible that, given the language of these statutes and the articulated labor-relations policy of § 28-7-2, the Legislature also intended supervisors and managers to be able to organize and present grievances in the same manner and within the same bargaining units as their subordinates."
 463 A.2d, at 191 (Footnote omitted).
The reason that supervisory and managerial employees may not be represented in a bargaining unit is because the very nature of their employment and its duties would divide their loyalty to their employer from that to their fellow employees. The conflict of interest would be intolerable to them as well as to their employer and to the employees subject to their supervision and management. Since it is that conflict which impels the exclusion of supervisory and managerial employees from a collective bargaining unit, it must be the existence or non-existence of that conflict which gives shape to the definition of those terms when they appear in a labor relations statute like § 28-9.4-2.
In its November 7, 1973 decision, referred to with approval by the Supreme Court in Local 2883, AFSCME, supra, the Board limited the notion of "supervisory" employees to what it called "top level supervisory personnel," and left to case-by-case determination what particular jobs or positions would fall in the category of "top level supervisory personnel." The Board did adopt the following doctrine, which it says has been its consistent position since 1973:
 "However, we do feel that a top level supervisor would be one whose duties and tasks and functions are purely supervisory in nature and who of necessity partakes more of the nature of management and policymakers then (sic) of rank and file". (Emphasis supplied).
 Decision and Direction of Election, October 22, 1992, p. 4.
The Board also quoted a November 1979 policy statement at length and relied on it heavily in its decision. That policy statement, however, provided guidelines only for deciding whether or not to exclude a supervisory position from a "rank and file" bargaining unit.
The Board recognized that the bargaining unit that Local 64 sought to have certified was not a "rank and file" unit. Accordingly, the policy statements of 1973 are of limited value in deciding whether employees, who are supervisory or managerial enough that they don't belong in a "rank and file" unit, such as that represented by Council 94, AFSCME, Local 1793, (hereinafter simply "Local 1793") are not sufficiently supervisory or managerial enough to be excluded from collective bargaining with their employer altogether. The Board has nevertheless decided that employees, who would plainly have been considered "bosses" in the labor struggles of the first half of this century, may now themselves organize and bargain collectively, if they are not "top level" supervisors, even though they would not be permitted to infiltrate rank and file units. Applying these policy statements the Board meticulously analyzed the work duties performed by the respective employees in each position as to each reason the plaintiff claimed the employee was subject to an exception.
The plaintiff argues that the Board should have applied different standards from those articulated in the 1973 and 1979 policy statements. The strong reliance on United States Supreme Court decisions by our Supreme Court in Local 2883, AFSCME,supra, and the language in Barrington School Committee v.Rhode Island State Labor Relations Board, 120 R.I. 470, 479,388 A.2d 1369, 137 (1978) (Barrington School Committee I) recognizing parallels between our state system of labor regulations and the Federal system, leads the plaintiffs to argue that the Board ought to follow Federal labor law precedents in determining the scope of the exclusion of supervisory and managerial employees from bargaining unit. As to each position the plaintiff points out that employees whose jobs were substantially similar to those in question here were found by the National Labor Relations Board or the Federal Courts to be supervisory or managerial employees.
Deference to holdings of the NLRB and Federal Court decisions in this area must be highly guarded in the light of our Supreme Court's observation in Barrington School Committee v. RhodeIsland State Labor Relations Board, 608 A.2d 1126, 1137 (R.I. 1992) (Barrington School Committee II) that a broader
definition than the one found in Federal rulings regarding employees considered to be confidential might be desirable in circumstances other than those in that case. Our Court's reservations were based, according to a footnote, on a minority concurring opinion in NLRB v. Hendricks County Rural ElectricMembership Corp., 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981), which our Supreme Court said "bears examining."[1]
In its decision the Board made no reference to any Federally promulgated standards and based its conclusion that each employee was not supervisory or managerial on its own standards for deciding whether an employee should be excluded from a rank and file bargaining unit. On this appeal Local 64, joined by the Board, argues that it was not error to follow those standards, but also that, if it should have followed the standards articulated by the National Labor Relations Act and cases decided under that Act, it correctly found that none of these employees were managerial or supervisory. As has been pointed out, the Board need not accord any deference in this area to National standards. The question is whether or not the standards actually applied by the Board adequately address the conflict of interest, or divided loyalties, problem sought to be resolved by the statutory exclusion of "supervisory" and "confidential" employees and the public policy exclusion of "managerial" employees from labor unions.
The Board concluded that it would allow employees who exercise some supervisory function but who are not "top level" supervisors and whose tasks and functions are not "purely" supervisory to organize and bargain collectively. The problem is that the Board promulgated no standards for distinguishing between "top level" and other supervisors or between tasks and functions "purely" supervisory and those which are otherwise supervisory. It appears that the Board applies more or less adhoc decision-making on a case-by-case analysis without reference to any distinguishing standards. None of the employees' duties in this case were compared with those of others who have been held to be "top level" supervisors or not "top level." The Board did not consider how any of those employees compare with the business manager of the Barrington school department inBarrington School Committee II, supra, or the superintendent of the Ladd School in Local 2883, AFSCME, supra, both of whom were regarded by the Supreme Court as managerial enough to be excluded from the benefit of our Labor Relations Act. From the Board's analysis it is difficult to see that the plaintiff hasany supervisory or managerial employees other than the statutory commissioners appointed by the mayor pursuant to §45-25-10, who are excluded from collective bargaining anyway under § 28-9.4-2(b)(2) as "Board and Commission members."
Because the Board's analysis is flawed by its reliance on standards which were designed to distinguish supervisors and managers from rank and file workers, and because its reference to "top level" supervisors and "purely" supervisory work functions are not useful in deciding which supervisors and which managers may be included in bargaining units, which do not consist of rank and file workers, its decision is affected by error of law. Nevertheless § 42-35-15(g) has a built-in harmless error rule, because this Court will reverse or modify the Board's decision only "if substantial rights of the appellant have been prejudiced." This Court must review the Board's decision as to each employee to determine whether or not on the basis of the facts found by the Board and supported by the reliable, probative and substantial evidence on the whole record that employee is a supervisory or managerial employee, as properly defined in the law.
II.
The plaintiff is a city housing authority created and existing pursuant to G.L. 1956 (1991 Reenactment) § 45-25-7,
and consists of five commissioners appointed by the mayor of the city under § 45-25-10. Among its other functions the plaintiff is authorized by § 42-25-15 to manage any public housing project in the city, which includes low and moderate income housing and housing for the elderly. It also manages some housing in a scattered site program as well as administers some aspects of so-called "Section 8" housing. The ultimate authority and responsibility for carrying on the plaintiff's functions is reposed in the five politically appointed Commissioners, who meet monthly. All policy is formulated by the Commissioners. They have the sole power to hire and fire all employees. All discipline is subject to their ultimate approval. They are the only persons who can bind the plaintiff in collective bargaining. Although statutory provision is made for the modest compensation of the commissioners of some city housing authorities by § 45-25-10(c)and (d), there is none for the plaintiff's Commissioners.
It is quite clear that the Commissioners do not manage or exercise direct control over the day-to-day operations of the plaintiff nor can they supervise their employees' performance of their job functions on a regular ongoing basis. For that they must and do rely on the Executive Director. The question of fact presented in this case is whether any of the employees in question are so directly involved with the Executive Director in these management and control functions or in the supervision of the work of other employees in the proposed bargaining unit on such a regular basis that it would be a conflict of interest for any of them to bargain collectively with the plaintiff whom they represent. Accordingly, the Board's findings that any of these employees did not have the authority to hire or fire other employees, or did not set policies by which the plaintiff is operated, or did not set or establish labor policies, or did not establish performance standards for other employees, or did not set and approve the terms of any collective bargaining agreement are of limited usefulness in considering whether these employees were supervisory or managerial. Of course, if any of them did exercise those powers this would be a far different case, but the fact that they do not is not dispositive of the question.
Under the collective bargaining agreement with Local 1793, Council 94, AFSCME (hereinafter "Local 1793"), which represents the plaintiff's clerical and maintenance employees, there are four forms of disciplinary measures: oral and written reprimands, apparently referred to as "warnings", suspension and discharge. Only the Commissioners can discharge an employee. The executive director can impose a suspension as well as oral or written reprimands or warnings. Certain of the employees in this case can issue warnings but cannot suspend any employee.
The agreement provides for a three-step procedure for resolution of grievances which applies to disciplinary actions. The first step is a presentation of a written grievance by the aggrieved employee or the union to the employee's supervisor, which includes in some cases the employees in question, as well as the working foremen, who are members of the unit represented by the union. Appeal from lack of resolution at step one is to the Executive Director, or his designee, who in some cases may be one of the employees in question. The decision at this step must be from the director. From this second step a dissatisfied employee may submit the grievance to binding arbitration as step three. The record does disclose a "shop practice" of appeal from the director's designee in step 2 to the director, which the witnesses called step 3. It is noteworthy that at the request of the union a section 25.13 was added to the agreement in 1990 requiring the plaintiff to clearly define in writing the chain of command for day-to-day operations as well as a list of immediate supervisors for grievance handling. Apparently there was some confusion at the time as to who was whose boss. The Commissioners are not involved in the grievance procedure at all.
The Board's finding that these employees did not have any authority, or final authority to resolve grievances is immaterial, because they do not seek to be part of a bargaining unit which includes members of Local 1793, so there is no potential conflict. Clearly some of these employees were sometimes authorized to resolve grievances, either those that were favorable to an employee or from which an employee pursued no appeal to a higher step. It is true, nonetheless, that the Executive Director was the final internal management authority with any power to resolve grievances from Local 1793 employees. The implication of the Board's decision is, however, that the Executive Director is the only supervisory or managerial employee of the plaintiff for collective bargaining or grievance resolving purposes. No version of the uncontradicted evidence in this case can possibly support such a drastic conclusion.
III.
CLAIMS OF MANAGERIAL AND SUPERVISORY POSITIONS The Director of Modernization and Development.
The Board correctly found that the written job description of this position contained only two provisions which were expressly supervisory. It also concluded, as a fact, that there was no evidence that the employee in that position actually carried out those particular functions. The Board in that respect is correct. There is no evidence that this employee ever oversaw the training of another employee or `directed the work efforts' of other employees `to deal with priorities.' The Board cannot be faulted for failing to be persuaded by evidence that this employee had authority to assign overtime or call employees back to work on weekends, in the absence of any showing that the callbacks were not in accordance with an established routine or had anything to do with priorities.
This employee did discipline other employees through oral and written warnings and had authority to resolve employee grievances as the designee of the executive director. He could and did effectively recommend the demotion and discharge of employees. He served on behalf of management on the negotiating committee which negotiated collective bargaining agreements with Local 1793. The agreements recommended by the committee have always been approved by the Commissioners. He evaluated probationary employees and his recommendations as to whether they should be retained were invariably accepted by the Commissioners. He has interviewed prospective employees as maintenance workers, working forepersons and housing managers.
While the Board may have been correct to observe that this employee's function was not `purely' supervisory in nature, the Board was clearly wrong in concluding as a matter of law that he did not perform enough supervisory functions to be considered a supervisory employee with regard to other employees in the proposed bargaining unit.
When these employee supervision functions are considered together with the rest of this employee's duties the managerial nature of his job is manifest. The Director of Development and Modernization is obviously a high-level assistant to the Executive Director. The employee's uncontradicted description of his job at the hearing unquestionably demonstrates that he is a key high-level management employee of the plaintiff:
 "Q. Would you discuss, using that as a reference, where it's got Principal Duties listed here, would you discuss what those duties are and how you perform them?
 A. Basically, I oversee the physical structures, which can involve implementing corrective action on utility consumptions; I would be ultimately responsible for the utility consumptions, analytical surveys, whether it be leaky roofs or faulty glass or glazing problems; oversee training of maintenance staff or the need for it; preparing budget recommendations for physical properties, also based on material received from the Complex Managers and foremen, ultimately I would put together a budget recommendation with dollars and quantities by the complexes; write applications for comprehensive modernization programs. The last five-year plan I prepared the management needs plan.
 Q. What's a five-year plan?
 A. That is our goals, objectives and strategies for the next five years.
 Q. You prepared that?
 A. Yes, with an implementation schedule and the dollar values, and on the physical needs end of it we used Bryant College to do the leg work and carry out some of the survey information that our tenants had filled out. Coordinating equipment inventory and central supply, but that's also heavily dealt with through the Comptroller, but I will be involved in the direct implementation of the perpetual inventory and the fixed assets; directing work efforts that deal with priorities, oversee requisitions, physical plan, I will establish the need for the materials.
 Q. When you say the need for the material, you mean the —
 A. Material and equipment. I would be filling out the requisitions, the purchase orders, or preparing the specifications if the need is there; and I do have a relationship with the budget, at least a general knowledge of the availability, and it fits the criteria, but the Comptroller is also signing those requisitions to establish it isn't violating a policy, and the Director is ultimately responsible for those. Overseeing contracts for architects, engineers, and contractors —
 Q. Excuse me, when you talk about contracts, are you involved in putting contracts out for bid or what —
 A. $10,000 and under I will prepare the procurement documents and solicit the informal inquiries and award the contracts or make the purchase order. For contracts over $10,000, I will prepare the bid specifications, on occasion I will do the plans and the bid documents, solicit it, and then make recommendations to the Board of Commissioners on the vendor and the best interests of the Housing Authority and then oversee property disposition."
 Transcript, Vol. II, pp. 121-24, May 13, 1992.
If this employee is included in a bargaining unit, management is stripped of full representation by a high-level employee able to preserve its interests in those special areas of responsibility assigned to this position in the management of the plaintiff's funds and resources in its physical plant.
The Board was clearly wrong as a matter of law in finding that this employee was not managerial enough for him to be excluded from membership in a bargaining unit because of a conflict of interest.
 The Comptroller.
This employee is obviously the plaintiff's principal financial management employee. In the past this position was designated as Deputy Director/Comptroller. The employee in this position apparently was then `second-in-command' and filled in for the executive director during his absence. The record is not really clear as to whether some of the supervisory activity of a prior employee in this position was carried out by him as comptroller or as deputy director. The position of comptroller, as distinguished from deputy director/comptroller, appears to have been first described on November 8, 1990.
The petition was filed on January 16, 1991. The incumbent, if there was one, in this position on that date may or may not have been performing the same job as that of the former Deputy Director/Comptroller. By the time the incumbent testified on May 18, 1992 it was clear he was not. That employee described his job as follows in uncontradicted testimony:
 "Q. Could you tell us about your job, what you do?
 A. My job routinely is to supervise the bookkeeping and accounting functions in the Housing Authority, as well as the computer systems management. Day-to-day I manage the actual accounting procedures and practices; I handle the routine investments of excess funds; I handle or supervise the preparation of payroll, preparation of accounts payable checks and disbursements, the accounts receivable and cash receipts functions. I think that describes the bulk of my duties, and other duties that the Executive Director assigns to me.
 Q. Do you work on developing the annual budget?
 A. Yes. At various periods throughout the year I also prepare the initial draft of the budget based on facts and recommendations from the Director of Development. I also prepare quarterly, annual and other periodic financial statements for the Authority for either operations or various grant programs that we administer, and the budgets for those programs. Those budgets are then submitted to the Executive Director for his consideration.
 Q. Where do the budgets ultimately end up?
 A. Ultimately the budgets end up with the Board of Commissions for approval.
 Q. Then do they go to HUD?
 A. Then they go to HUD.
 Q. Do you get involved in any purchasing being made, purchases being made by the Housing Authority?
 A. I would be involved in making recommendations for purchases within the guidelines that we have for our policy. Petty cash purchases, I can act unilaterally. Purchases up to designated amounts, I can make recommendations based on telephone solicitations for the lowest price. Anything above that we have to go to competitive bidding. And all purchases that are made ultimately come across my desk for review in order to make determinations as to their compliance with our budgetary limitations.
 Q. What is that limit that you can make the phone call —
 A. I believe the limit for a phone solicitation is now $5,000 —
 MR. LAFOND: Ten.
 A. . . .$10,000, it was just recently modified, and anything above that requires competitive bidding.
 Q. Do you supervise any clerical employees?
 A. Yes. There are three bookkeepers that I supervise directly day-to-day. They have a fairly routine set of job duties that they follow, but if there is any change that has to be made or any special work that has to be done, I would assign it according to my staff and availability there; and, when needed, any part-time staff that may be assigned to me, I assign those duties also.
 Q. Now, those people are represented by Local 94?
 A. Yes, the three bookkeepers are.
 Q. Do you have any non-union people that you supervise?
 A. Yes. I supervise the — I think we described it here as a Systems Administrator. She handles management of our computerized reporting systems, performing various functions where I may direct her to provide us with some information that's built into our computer system."
 Transcript, Vol. III, pp. 201-04, May 18, 1992.
The supervision described is precisely the kind of routine, non-judgmental supervision, which does not disqualify an employee from belonging to a bargaining unit. The level and degree of this employee's supervisory function does not make it unfair or conflictual for the plaintiff to be compelled to bargain collectively with him and his fellow non-clerical and non-maintenance employees. The Board was not clearly wrong as a matter of law to have concluded he was not a supervisory employee at a material time, even if it might have been wrong in concluding that the position itself prior to November 11, 1990 was not supervisory.
From the job description and the employee's description of his functions it is clear that he is a high-level staff employee. What is not clear is whether or not he is a manager in the sense that he directs or supervises the activities of subordinate employees in carrying out the operations of the employer. Although keeping accurate financial records and reports, and complying with fiscal requirements of governmental funding agencies may be important, it is not the primary function of the plaintiff, which is to provide housing of a certain quality to persons entitled to such housing. Likewise, while budgeting and purchasing are important management functions they do not directly involve the control and direction of employees who provide, manage and maintain the housing which the plaintiff furnishes to its tenants.
Accordingly, the employee in this position as presently constituted does not have such managerial functions as to give rise to a conflict of interest for him to be a part of a collective bargaining unit. The Board was not clearly wrong in so finding.
 The Senior Housing Manager and the two Housing Managers.
Based on their job descriptions and from the testimony of the Executive Director and the Director of Modernization and Development at the hearings these employees are baseline property managers for the respective projects or buildings assigned to each of them. These employees are obviously supported in their jobs by maintenance and clerical employees, but their supervision of the work performed by their supporting employees is minimal or routine at best. These supporting employees are principally supervised on a day-to-day basis by the Executive Director, and to a limited extent by the Director of Modernization and Development, but not the Housing Managers.
While there might be some conflict if these employees were included in a bargaining unit with their supporting employees, no such conflict arises out of their combination for collective bargaining purposes with each other and the Comptroller and the Systems Administrator. The Housing Managers have very limited disciplinary authority with respect to the clerical and maintenance personnel who work in the projects they manage. They have none with respect to each other or the Comptroller or the Systems Administrator. If they are the first step, or level, in the grievance procedure for Local 1793 employees, it is inconceivable that they could or would attempt to afford relief from a work decision made by the Executive Director or the Director of Modernization and Development. Their grievance-resolving authority is so elementary that it has been sometimes exercised by working forepersons in Local 1793. There is no reason to believe they would be so involved with each other or the Systems Administrator or the Comptroller.
Based on the record the Board was clearly right in finding that these employees were not supervisory or managerial, as defined.
 The Systems Administrator.
The plaintiff does not claim that the Systems Administrator is a managerial or a confidential employee. It does argue that the position is a supervisory one.
From the job description and the testimony produced at the hearing it is clear that this position is filled by a specialist in the function of the computerized data processing system used by the plaintiff. It is clearly a technical position. The training and supervision of other employees by this one is limited to that necessary to allow them to use the computer system effectively. The supervision referred to is not the kind of supervision which creates a conflict between the supervised employees and the supervisor as the employer's representative. If a computer specialist trains and "supervises" a chief justice in the use of a computer, the specialist cannot be said to "supervise" the chief justice in doing his or her job in the sense the word is used in this statute.
The Board was clearly right in finding that the Systems Administrator was not a supervisory employee. In fact, the position could just as easily have been included in Local 1793, if it had been requested.
IV.
The plaintiff claims that the Executive Secretary to the Executive Director, the Director of Modernization and Development, the Comptroller, and the Senior Housing Manager and the two Housing Managers are confidential employees. According to the so-called "labor-nexus" test, approved with some reservation in Barrington School Committee II, supra, the first category of employees who are excluded from collective bargaining units are those who assist and act in a confidential capacity to persons who formulate, determine, and effectuate management policies in the field of labor relations. The Board in its decision as a practical matter wrote the word "assist" out of the legal definition of this category of employee. Obviously, it is the Commissioners who "formulate, determine and effectuate" pertinent policies. Equally obviously, a part-time non-expert group of Commissioners cannot without assistance carry out their labor relations responsibilities. The Board recognized these obvious facts when it grudgingly acknowledged that perhaps the Executive Director acts in that capacity.
 The Director of Development and Modernization.
The evidence is uncontradicted and undisputed that the plaintiff negotiated collective bargaining agreements with Local 1793 through a negotiating team made up of the Executive Director, the Deputy Director/Comptroller and the Director of Development and Modernization. It is clear that it was in his role as deputy director, and not as comptroller, that the former Deputy Director/Comptroller participated in collective bargaining on behalf of the plaintiff. While ultimate approval of the terms of any such agreement was vested in the statutory commissioners, they invariably approved the proposals submitted by their negotiating team. There can be no question that the negotiating team assisted and acted in a confidential capacity to the Commissioners in collective bargaining, undeniably the most fundamental element of modern labor relations.
In addition, as has been pointed out, the employee in this position plays some role in the hiring and employee discipline process, although not a finally determinative one. He is also involved in the grievance procedure under the agreement with Local 1793. It is not clear, nonetheless, whether he plays any such role with regard to the employees proposed for the bargaining unit in this case, but there is no basis to suggest he does not and would not. By putting him in the bargaining unit in this case, the Executive Director is left by the Board to deal single-handedly with Local 64 in labor relation matters on behalf of the plaintiff. It seems clear from the evidence that many of the management functions of this employee will impact directly on the job conditions of other employees in the proposed bargaining unit. This employee would necessarily find himself in a conflicted position if his projects were to become the source of grievances by other employees in a unit, in which he is compelled to be a member.
There is utterly no evidence which supports the Board's conclusion that the Director of Development and Modernization is not a confidential employee.
 The Comptroller.
There is no evidence that the employee in this class position fits in the first category of confidential employee described in the "labor-nexus" test. There also is no evidence that there would be any conflict between his managerial responsibility to the plaintiff and his loyalty to the bargaining unit proposed in the petition. Although there might be some tension between this employee and the Systems Analyst, they are no different from those as may arise in any managerial staff. They are reconcilable by the Executive Director or his high-level assistant, the Director of Development.
The second category of confidential employee consists of employees who in the course of their duties "regularly have access to confidential information concerning anticipated changes which may result from collective bargaining negotiations." The evidence is clear that this employee, if he does have any access to confidential information, does so on a casual and irregular basis.
The Board was clearly correct in finding that this employee is not a confidential employee.
 The Systems Administrator.
The plaintiff makes no claim that the Systems Administrator is a confidential employee.
 The Senior Housing Manager and the Housing Managers.
Although the employees in this class do attend meetings of the Commissioners at which personnel and labor relations matters are discussed, there is no evidence that they assist or act in a confidential capacity to the Commissioners in these matters. Any access they have to confidential labor relations matters is clearly casual and not regular. Nor does it occur in the course of their duties. Their involvement in the investigation and resolution of grievances pertains clearly to the members of the unit represented by Local 1793. There is no reason to believe they would be expected to play the same role with respect to their fellow employees represented by Local 64.
The Board was clearly right to find that these employees were not confidential employees.
Secretary to the executive director. The plaintiff makes no claim that this is a supervisory or managerial position. It does claim that it is, however, a "confidential" position as defined in Barrington School Committee II, supra.
The services rendered by this employee as secretary to the Executive Director are substantially indistinguishable from the services rendered by the secretary to the business manager of the Barrington school department. The Executive Director in this case is clearly the functional equivalent of the business manager in the Barrington School Committee II case. The secretary in each case performed the same functions with regard to labor-management matters. The fact that in the temporary absence from work of the employee who regularly filled this position some substitute filled in is immaterial. Surely, the business manager's secretary in the Barrington school department would be expected to go on vacation from time to time.
While the Board claimed to have applied the tests for confidentiality prescribed by the Barrington School CommitteeII case, it failed to apply the result reached in that case to a substantially indistinguishable fact situation. The Barrington School Committee there is plainly analogous to the Commissioners here. The business manager there is plainly analogous to the Executive Director here. As has already been pointed out the secretaries in each case perform virtually identical functions in labor-management matters.
The inclusion of this position in the bargaining unit in utter disregard of uncontradicted evidence and a clear-cut factual precedent from the Supreme Court is plainly wrong as a matter of law.
V.
For the foregoing reasons, in accordance with §42-35-15(g), the Decision and Direction of Election will be modified to delete therefrom and to exclude from the bargaining unit therein described the employees in the class positions of Director of Modernization/Development and Executive Secretary to the Director. This matter will be remanded to the Board for such further proceedings as it may deem necessary and appropriate with regard to a representation election and collective bargaining between the plaintiff and Local 64.
The Court is mindful of the difficult task the Board confronts when it must decide what employees are excluded from the benefits of mandated collective bargaining when mid-level managers seek to organize. The solution worked out by the Board of different and separate bargaining units for the "rank-and-file" and mid-level management is admirable and ultimately just. The Board is urged to consider a conflict of interest analysis when it tries to resolve the status of employees in the gray area between the top of mid-level management and the bottom of the level of management whose loyalty must be exclusively with the employer. The objectives of the State Labor Relations Act would best be served by as clear a definition as possible of the hyphen between "labor" and "management" in "labor-management" relations.
The plaintiff will present a form of judgment for entry upon notice to the defendants.
[1] The Court has read the Opinions in NLRB v. Health Care Retirement Corporation of America, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 62 L.W. 4371 (May 23, 1994) with great care. This case adds nothing to and relies heavily on NLRB v. YeshivaUniversity, 444 U.S. 672 (1980). Yeshiva University was important in the ruling in Local No. 2883, AFSCME, supra.
Since the General Assembly has not otherwise defined "supervisory" and the Supreme Court has not otherwise defined "managerial," the Health Care Retirement Corporation ofAmerica case is not helpful.