**COUNCIL 94, AMERICAN FEDERA-
TION OF STATE, COUNTY, AND MU-
NICIPAL EMPLOYEES AFL–CIO**

v.

**STATE of Rhode Island.**

**No. 82–47–Appeal.**

Supreme Court of Rhode Island.

April 10, 1984.

Gerard P. Cobleigh/Allison Rock, Warwick, for plaintiff.

John Turano, Westerly, State Labor Relations Administrator, Dennis J. Roberts II, Atty. Gen., Donald G. Elbert, Jr., Asst. Atty. Gen., for defendant.

Before BEVILACQUA, C.J., and KELLEHER, WEISBERGER, MURRAY and SHEA, JJ.

## OPINION

KELLEHER, Justice.

Many who read the title of this litigation will surmise that this is another case involving a dispute over an arbitrator's award, and they will be correct. This controversy is before us after a Superior Court

justice denied the union's motion to confirm an arbitrator's award and granted the state's motion to vacate the award. We reverse.

The factual aspects of this dispute which are set forth in the award[1] indicate that a union member, Walter Spiry, worked for six years as a civilian employee in the Control Service Unit of the Division of State Police (division). He operated the division's computer that was tied into the National Crime Information Center (NCIC). On November 20, 1977, Spiry was working on the midnight to 8 a.m. shift. He was operating the NCIC computer, and another employee with approximately two years' experience on the job was responsible for the operations relating to the unit's teletype. At approximately 7:42 a.m. Spiry's supervisor arrived for work and noticed that three teletype messages that had been received during the shift had not been transferred onto punch cards, which could then be entered into the computer. The record indicates that one message had been received at 1:05 a.m., another at 2:30 a.m., and the third at 7:15 a.m. What then occurred was and is the subject of divergent views.

The supervisor told the arbitrator that when he first arrived at the control unit, he told Spiry to put the three messages on computer cards so that the information could in turn be relayed to NCIC. According to the supervisor, after three requests had produced no result, he ordered Spiry to make out the cards. At 7:55 a.m. when the supervisor noticed that the cards were not made out, he punched out the three cards, and at 7:59 a.m. he told Spiry he "could go home."

The records indicate that later on during that same day, the commanding officer of the State Police sent a letter to Spiry in which he notified the worker that "effective immediately" he was being dismissed from his job because of his "refusal to comply with a direct order from your immediate Supervisor * * *."

In his appearance before the arbitrator, Spiry said that when his supervisor arrived at the unit, he (Spiry) was engaged in attempting to check out the ownership of a weapon found by the Narragansett police department in the possession of two suspects then in custody. When the supervisor asked Spiry if he was going to punch out the three cards, Spiry replied, "Why? Is it my job?" Spiry denied that the supervisor had ever ordered him to punch out the cards. He testified, "If he had told me to do it, I would have done it." Spiry also stated that as a general practice, the teletype operator would punch out the cards during his spare time whereas the computer operator's responsibilities were strictly related to the computer.

The state then offered rebuttal testimony, both documentary and testimonial, from the supervisor.

It was stipulated that the expeditious distribution of information gained from the teletype plays an important role in police activities. It was also conceded that the policy within the department had been that the computer operator would not feed information into the computer until he had in his possession ten or twelve punch cards. There was no evidence to indicate that there were any other computer cards waiting to be placed into the computer.

The union, acting pursuant to the provisions of the collective-bargaining agreement, filed a request that the dispute be settled by arbitration. The issue presented by the parties to the arbitrator read, "Was the grievant, Walter Spiry, discharged without just cause? If so, what shall the remedy be?"

In giving an affirmative answer to the "just cause" issue, the arbitrator, after noting that in the labor-relations field a discharge is regarded as the equivalent of "economic capital punishment," pointed to

1. Since neither the union nor the state desired a transcript of the proceedings before the administrator, no stenographic record was made.

several factors that led him to believe that Spiry's discharge was without cause. He alluded to the failure to warn Spiry of the possible consequences of his refusal to comply with the supervisor's order; the lack of evidence that the division conducted an objective investigation into what had actually happened on the day in question, including the failure to interview any other employees who were on duty with Spiry; and the absence of any testimony indicating that Spiry did in fact have the time to prepare the punch cards when he was asked to perform the task.[2] Accordingly, the arbitrator, having in mind these circumstances, ruled that a justifiable disciplinary action was a one-week suspension without pay.

Consequently, he ordered that Spiry be reinstated with full back pay minus one week's salary and that, in computing the back pay, *no credit should be given the state for any* unemployment benefits that Spiry might have received during his absence from state service, nor should any credit be given for any retirement benefits he might have been receiving as a result of his prior twenty years of service with the Providence police department. The arbitrator did allow the state to receive credit for any wages or earnings that Spiry might have received from any employment that he had undertaken during this period.

**2.** The arbitrator, in relying on the factors enumerated above, was following the criteria set forth by another arbitrator in *Grief Bros. Cooperage Corp.,* 42 Lab.Arb. 555, 558 (1964) (Daugherty Arb.), who determined that evidence of "just cause" for a discharge was to be determined by the response to a series of questions. A negative response to one or more of the following inquiries would normally signify that "just cause" did not exist.

"(1) Did the Company give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?
"(2) Was the company's rule or managerial order reasonably related to the orderly, efficient, and safe operation of the Company's business?
"(3) Did the company, before administering discipline to an employee, make an effort to discover whether the employee did in fact

The trial justice, in vacating the award, found fault with the remedy fashioned by the arbitrator in two respects. With respect to the imposition of a one-week payless suspension period, the trial justice referred to article XXIV, specifically sec. 24.-1, which provides that discipline is to be imposed only for just cause and then goes on to say, "Where appropriate, disciplinary action or measures shall include only the following: 1. Oral reprimand, 2. Written reprimand, 3. Suspension, 4. Discharge, 5. Demotion where appropriate," and then sec. 24.2, which stipulates that the "Appointing Authority shall not discharge or suspend an employee without just cause." Thereafter, the trial justice construed these two provisions to mean that the imposition of discipline remained the exclusive prerogative of the appointing authority and that whatever discipline the authority imposed was to be limited to the five categories detailed above.

The second area of disagreement with the arbitrator is concerned with that portion of the award that allows Spiry to retain compensation benefits he may have received during any period when he might have been unemployed. The trial justice again referred to art. XXIV, specifically sec. 24.3, which provides that any employee who successfully challenges by way of the grievance procedures a dismissal, demo-

violate or disobey a rule or order of management?
"(4) Was the Company's investigation conducted fairly and objectively?
"(5) At the investigation did the 'judge' obtain substantial evidence or proof that the employee was guilty as charged?
"(6) Has the company applied its rules, orders, and penalties evenhandedly and without discrimination to all employees?
"(7) Was the degree of discipline administered by the company in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the record of the employee in his service with the company?"
These criteria have been described as the "most widely accepted principles" employed whenever an arbitrator is considering a discharge involving insubordination. *Cotton Bros. Baking Co.,* 68 Lab.Arb. 151, 154 (1977) (Hon. Arb.).

tion, or suspension is to be restored to his former position and "compensated at his regular rate for any time lost during" that period. The trial justice was of the belief that sec. 24.3 would bar the retention of compensation benefits. Otherwise, in the trial justice's opinion, Spiry was being compensated in excess of his regular rate.

Recently, in *Rhode Island Council 94 v. State*, R.I., 456 A.2d 771, 773, 775 (1983), after citing *Jacinto v. Egan*, 120 R.I. 907, 911, 391 A.2d 1173, 1175 (1978), and *Belanger v. Matteson*, 115 R.I. 332, 355, 346 A.2d 124, 137–38 (1975), we once again stressed that judicial authority to overturn an arbitrator's award is quite limited. Unless there has been a manifest disregard of a contractual provision or a completely irrational result, the award will be upheld. R.I., 456 A.2d at 773. Judicial review is to focus only on whether an arbitrator has resolved the issue by considering the proper sources, to wit, the contract and the common law of the shop, not on whether the arbitrator has correctly resolved the grievance. *Id.* We also emphasized that judicial reversal of an arbitrator's award solely on the ground of a reviewing court's disagreement with his construction of the contract is prohibited. *Id.*, 456 A.2d at 775.

Again, in *Rhode Island Council 94 v. State*, we endorsed the proposition that an arbitrator has the inherent power to fashion an appropriate remedy as long as the award draws its essence from the contract and is based upon a "passably plausible" interpretation of the contract. *Id.*, 456 A.2d at 774–75. Section 24.1 specifically allows a disciplined employee to seek redress through the procedure set out in article XXV. Section 25.2(c) provides that if a

grievance is not settled in a satisfactory manner to the aggrieved member, such grievance will be submitted to arbitration. Section 26.1 calls for the grievance to be referred to the American Arbitration Association, and sec. 26.2 states that the arbitrator's decision "shall be final and binding."

Here, the arbitrator thought that the prescribed appropriate disciplinary measures set forth in sec. 24.1 were inappropriate in the light of the record, and he consequently designed sanctions that he believed to be appropriate, a one-week suspension from work without pay. The approach taken certainly draws its essence from the contract and the law of the shop and consequently merits judicial approval. What we have said about the disciplinary issues applies equally well to the award of back salary without deducting any unemployment-compensation benefits that Spiry might have received.

The arbitrator, in not reducing the amount of back pay by the amount of unemployment-compensation benefits, was following the lead of the United States Supreme Court in *National Labor Relations Board v. Gullett Gin Co.*, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951), where the Court, in upholding the board's refusal[3] to deduct such benefits in making a back-pay award, observed:

"Payments of unemployment compensation were not made to the employees by respondent [employer] but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obliga-

---

**3.** The Supreme Court emphasized, after alluding to the wide variety of compensation laws that are on the statute books, that an arbitrator's award may not be binding upon the states and also emphasized that recoupment of benefits in such situations is a matter between the state and the employee. *National Labor Relations Board v. Gullett Gin Co.*, 340 U.S. 361, 365, 71 S.Ct. 337, 340, 95 L.Ed. 337, 343 (1951). General Laws 1956 (1979 Reenactment) § 28–42–68 gives the Director of the Department of Employ-

ment Security the discretion to seek recovery of any benefits that might have been paid to any individual who, by reason of mistake or misrepresentation, failed to satisfy the act's eligibility requirements. Rather than seek the recovery, the director is also authorized to deduct from any future benefits due a worker the amount of erroneously paid benefits. At this stage, since the question of recoupment is a matter that is directed to the discretion of the director, we shall offer no further comment.

tion of respondent, but to carry out a policy of social betterment for the benefit of the entire state. [Citations omitted.] We think these facts plainly show the benefits to be collateral." *Id.* at 364, 71 S.Ct. at 340, 95 L.Ed. at 342.

The approach taken by the arbitrator in this controversy has been endorsed by several federal courts, the National Labor Relations Board, and numerous arbitrators. *See Whatley v. Skaggs Companies, Inc.,* 707 F.2d 1129, 1139 (10th Cir.1983); *Kauffman v. Sidereal Corp.,* 695 F.2d 343, 347 (9th Cir.1982); *Equal Employment Opportunity Commission v. Ford Motor Co.,* 645 F.2d 183, 195 (4th Cir.1981); *Marshall v. Goodyear Tire & Rubber Co.,* 554 F.2d 730, 736 (5th Cir.1977); *Hopcroft Art and Stained Glass Works, Inc.,* 108 LRRM 1237 (1981); *Sioux Falls Stock Yards Co.,* 99 LRRM 1316 (1978); *In re Armour-Dial, Inc.,* 76 Lab.Arb. 96 (1981) (Aaron, Arb.); *In re National Linen Service,* 74 Lab.Arb. 857 (1980) (Dunn, Arb.). All of the above are of the one mind that unemployment compensation is neither pay nor wages. Rather, the benefits constitute a collateral benefit that the worker receives from the respective states as a matter of social policy. Thus, the arbitrator saw no violation of the "regular rate" proviso.

The state, in defending the trial justice's deduction of Spiry's unemployment-compensation benefits, refers us to *Bryson v. Clark,* 89 R.I. 183, 151 A.2d 688 (1959); *Meyers v. Director of Division of Employment Security,* 341 Mass. 79, 167 N.E.2d 160 (1960); and *Willis v. Dyer,* 163 N.J. Super. 152, 394 A.2d 383 (1978). All three cases involved back-pay awards to employees, and the issue in each instance was the propriety of a deduction. In the *Bryson* case the deduction was relief payments, and the Massachusetts and New Jersey controversies concerned unemployment-compensation benefits. However, only one of the authorities relied on by the state dealt with an arbitrator's award.

In *Bryson,* the court was concerned with the meaning of its mandate entered earlier in *Bryson v. Personnel Board of Pawtucket,* 83 R.I. 366, 116 A.2d 459 (1955), in which the court ruled that Bryson was to be restored to his former position as a truck driver for the city of Pawtucket and to receive the back salary thereof "from the date of his dismissal, less the amount of any and all compensation which he has received after that date from any other employment pending the outcome of the instant proceedings." *Id.* at 369, 116 A.2d at 461. During a portion of his absence from city employment, Bryson received a $23 weekly work-relief payment. The court, in explaining its mandate, said that the term "compensation" was intended to include "money he received while actually working in private or public employment regardless of its nature." *Bryson v. Clark,* 89 R.I. at 186, 151 A.2d at 689. In the court's words, Bryson "earned" his weekly relief payments by working for them. Thus, work-relief payments of close to $965 were to be deducted from the back-salary figure owed to Bryson.

In the *Willis* case, the New Jersey court merely ruled that unemployment-compensation benefits received by a worker during a period for which he was awarded back pay was recoverable by the state. In *Meyers,* the employee, who was laid off in violation of a collective-bargaining agreement, received an arbitrator's award consisting of his lost wages less any amounts he had received as unemployment benefits. The Massachusetts Supreme Judicial Court characterized the award as "remuneration from the employer as wages" and consequently ruled that the worker was not in "total unemployment during the period in dispute" and affirmed the trial court's finding that there had been an overpayment of benefits.[4]

Recently, in *School Committee of Newton v. Labor Relations Commission,* 388

---

4. The question of repayment of unemployment-compensation benefits receives a thorough analysis in Annot., 90 A.L.R.3d 987 (1979).

Mass. 557, ——, 447 N.E.2d 1201, 1216 (1983), the union challenged the commission's reduction of a back-pay award by the amount of unemployment compensation received by a group of custodians. The commission was motivated by the holding in *Meyers* and was of the belief that the failure to deduct the payments would have made the employees "more than whole." 388 Mass. at ——, 447 N.E.2d at 1216. This conclusion, the Massachusetts Supreme Judicial Court noted, was "within the commission's authority to fashion appropriate remedies," *Id.* and in a footnote the court alluded to the *Gullett Gin* case and pointed out that in the circumstances of the case the deduction ordered by the commission "was also within its discretion." *Id.* at ——, 447 N.E.2d at 1216 n. 14.

In the same vein, the arbitrator, in furnishing his remedy, took the opposite tack from that of the Massachusetts commission, and for that course of action he cannot be faulted. He has grounded his actions on his consideration of the collective-bargaining agreement and the common law of the shop.

The union's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court for the entry of a judgment affirming the arbitrator's award and denying the state's motion to vacate that award.