**STATE of Rhode Island DEPARTMENT OF CHILDREN, YOUTH AND FAMILIES**

**v.**

**RHODE ISLAND COUNCIL 94, AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL–CIO, et al.**

No. 96–77–Appeal.

Supreme Court of Rhode Island.

June 12, 1998.

---

Kevin J. Aucoin, for plaintiff.

Gerard P. Cobleigh, Warwick, and Patricia E. Andrews, Washington, DC, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

■ Did an arbitrator exceed his powers when he determined that a department of state government lacked just cause to fire a state employee after the employee was convicted of committing certain violent crimes—despite the fact that the employee's job responsibilities gave him unsupervised control over and contact with training-school children in the state's custody? For the reasons spelled out below, we answer this question in the affirmative.

The plaintiff, the Department of Children, Youth and Families (DCYF or the department), appeals from a Superior Court judgment granting defendants' motion to confirm and denying plaintiff's motion to vacate an arbitrator's award. The defendants are Rhode Island Council 94, American Federation of State, County, and Municipal Employees, AFL–CIO (union), and Maurice Howie (Howie), a union member employed by the State of Rhode Island (state) as a youth home-life supervisor at the Rhode Island Training School (training school). An arbitrator decided that DCYF did not have "just cause" to discharge Howie and that he should be reinstated to his position with back pay despite Howie's convictions for domestic assault, simple assault (domestic), and one count of issuing a fraudulent check while he was employed by the state training school as a youth home-life supervisor. Because we conclude that this decision exceeded the arbitrator's powers, we reverse the Superior Court's confirmation of this award and its refusal to vacate same.

## Facts and Travel

The state and the union entered into a collective-bargaining agreement (CBA) covering the period 1989 through 1992. The department hired Howie as a youth home-life supervisor at the training school on July 29, 1990. In this position, Howie was responsible for the supervision and discipline of juvenile offenders assigned to his custody and control. Most significantly, he was also able to have routine, unsupervised contact with and control over juveniles detained at the training school.

In February of 1992 the director of DCYF learned from a news reporter that Howie had been convicted of violent crimes during the brief period in which he had been employed as a youth home-life supervisor at the training school. In fact, certain officials at the training school had known about Howie's criminal record since June of 1991 when they had placed him on probation following his domestic-violence conviction. Howie had also been allowed to take a leave without pay from his job while he was incarcerated at the Adult Correctional Institution pending a probation-violation determination.

Once DCYF learned that the reporter knew about Howie's criminal record, it decided to take further steps in response to his convictions. At DCYF's request and pursuant to the CBA, a hearing convened on March 4, 1992 before an administrative hearing officer (hearing officer) concerning what effect these convictions should have on Howie's continued government employment at the training school. Despite being afforded the opportunity to do so, Howie chose not to participate in this hearing.[1] At the conclusion of the hearing, the hearing officer recommended that DCYF terminate Howie's employment on the basis that it had just cause to do so. Pursuant to the hearing officer's recommendation DCYF discharged Howie, effective March 6, 1992. In doing so, DCYF relied upon Howie's previously described criminal convictions to establish the existence of just cause, together with the Certification of Child Care and Youth Serving Agency Workers Act, G.L.1956 chapter 13.2 of title 40 (certification act), and DCYF policy Nos. 232 and 806, which govern criminal-records checks for, inter alia, prospective DCYF child-care employees, juvenile-facility operators, and consultants.

1. Although Howie and a union representative were present at the opening of the administrative hearing, they opted not to participate further after the hearing officer sustained DCYF's objection to their request to have a former juvenile-services official present at the hearing and to have DCYF make certain documents available to them for their inspection. The union representative advised the hearing officer that he had requested DCYF to have its former associate director of juvenile services present at the hearing and to have DCYF make available for his inspection documents regarding Howie's imprisonment and written communications relating to Howie that were exchanged during June of 1991 between the former associate director and another DCYF juvenile-services official.

After DCYF's representative objected to these requests on the grounds of irrelevance and immateriality, the union representative responded that after DCYF had knowledge of Howie's arrest in June of 1991, it allegedly "sat on [their] rights and didn't take any action." The union representative further stated that the former associate director would have information concerning why DCYF failed to take any action at that time against Howie. However, he did not indicate that the requested records or witness would be relevant or material for the purpose of showing that Howie's work record justified his retention as a DCYF employee notwithstanding his convictions. After the hearing officer sustained DCYF's objection on the grounds of materiality, the union representative advised Howie that they should not continue to participate in the hearing. At this point both Howie and the union representative left the hearing and never returned. Neither Howie nor the union representative ever indicated to the hearing officer that they intended to show that Howie's work record justified his retention at DCYF notwithstanding his convictions. Rather their request for certain documents and for the presence of a former DCYF associate director were apparently for the purpose of pursuing some sort of estoppel theory rather than to demonstrate that Howie's excellent work record justified his continued DCYF employment. In any event, under DCYF's regulations Howie, and not DCYF, bore the burden of producing witnesses and relevant information directed to this point. By leaving the hearing and by failing to subpoena the requested witness and documents, Howie forfeited any right to complain later that he was deprived of the opportunity to do so. Indeed, even during the later arbitration hearing, Howie failed to submit any evidence that would have allowed the arbitrator to conclude that DCYF should have exercised its discretion and retained Howie as an employee because, on balance, his outstanding work record outweighed his postemployment convictions for violent crimes.

Pursuant to the CBA the union filed a grievance on behalf of Howie. An arbitrator heard the grievance and issued a written decision in favor of Howie because he determined that both the certification act and DCYF's policies were applicable only to prospective rather than to current DCYF employees like Howie. As a result, the arbitrator concluded that DCYF had terminated Howie without just cause and ordered that he be reinstated with full back pay and benefits. The department then filed a petition with the Superior Court to vacate and/or to modify the arbitrator's award, and the union filed a complaint requesting its confirmation. A Superior Court justice denied DCYF's petition to vacate the arbitrator's award and entered judgment for the union on its complaint to confirm. The department has appealed from the judgment embodying these rulings.

### The Parties' Respective Contentions

The department maintains that the arbitration award exceeded the arbitrator's powers because it disregarded DCYF's management authority and responsibility to prevent employees like Howie, who have been convicted of violent criminal offenses, from having unsupervised contact with and control over children in the state's care and custody. It also contends that the Superior Court's confirmation of the award conflicts with state law and DCYF regulations, both of which, it argues, support its decision to terminate Howie. The department posits that the clear statutory intent of the certification act is to protect children in state care from individuals like Howie who have "disqualifying information" in their personal backgrounds, such as convictions for violent crimes. It asserts that the arbitrator's interpretation is contrary to the intent of the law and leads to an absurd result. The department also criticizes the arbitrator for distinguishing Howie's case from an earlier employment situation wherein a DCYF employee was discharged after having been convicted of a felony. It alleges that the arbitrator acted capriciously when he distinguished that case from this one on the basis that the former situation involved a felony whereas Howie's convictions were only mis-

demeanors. The department also relies on the just-cause and management-rights language in the CBA to support its position that it was entitled to terminate Howie.

The union and Howie, on the other hand, argue that the arbitrator correctly interpreted and applied the plain language of the certification act and DCYF's policies in reaching his decision. They assert that the act cannot be expanded by DCYF to cover existing employees when it clearly applies only to applicants for employment. In addition they contend that although applicants for DCYF employment could be hired pending a criminal-background check and therefore be subject to dismissal if the background check ultimately uncovers disqualifying information, this does not mean that existing employees are generally subject to dismissal if they are convicted of a crime after having been hired by DCYF. In any event, they argue, disqualifying information is not automatically grounds for dismissal because the employee is allowed to demonstrate during an administrative appeal that his or her employment record of excellence in providing child care warrants his or her retention. Finally, the union and Howie contend that this Court's recent decision in *Rhode Island Brotherhood of Correctional Officers v. State,* 643 A.2d 817 (R.I.1994), is supportive of their position. For the reasons discussed below, we agree with DCYF.

### Analysis

An arbitration award should be vacated if the arbitrator has exceeded his or her powers in making the award. *See Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections,* 707 A.2d 1229, 1234 (R.I.1998). The award will be deemed ultra vires if it did not "draw its essence" from the agreement, if it was not based upon a "passably plausible" interpretation thereof, if it manifestly disregarded a contractual provision, or if it reached an irrational result. *Id.* An arbitrator may also exceed his or her powers by interpreting a CBA in a way that contravenes state law or other public policies that are not subject to alteration by arbitration. *Id.* Finally, an arbitrator is "powerless to arbitrate that

which is not arbitrable in the first place." *Id.*

In analyzing this dispute, the arbitrator evaluated the certification act and the two policies promulgated by DCYF (Nos. 806 and 232), found them to be inapplicable to existing DCYF employees like Howie, and then proceeded manifestly to disregard DCYF's management and employment-termination rights under the governing CBA and DCYF's enabling legislation. Because the arbitrator exceeded his powers in doing so, the Superior Court erred in confirming this award.

The certification act provides guidelines for the qualification of persons

> "seeking to operate or seeking employment in any facility which is or is required to be licensed or registered with the department or *seeking employment at the training school for youth if that employment involves supervisory or disciplinary power over a child or children or involves routine contact with a child or children without the presence of other employees* * * *." Section 40–13.2–2. (Emphasis added.)

Essentially the certification act provides for preemployment qualification of people seeking to work in DCYF-licensed or registered child-care facilities or to work for DCYF itself in jobs involving contact with children in its care. The certification process involves an employment background check, a CANTS (child abuse and neglect tracking system) review of substantiated complaints, and a criminal-records check. *Id.* The specific section of the act applicable to this case is § 40–13.2–5, which provides in relevant part:

> "Any person seeking employment, if that employment involves supervisory or disciplinary power over a child or children or involves routine contact with a child or children without the presence of other employees, in any facility which is, or is required to be, licensed or registered with the department or seeking that employment at the training school for youth shall, after acceptance by the employer of the affidavit required by § 40–13.2–3, apply to

the bureau of criminal identification of the state police or the local police department for a nationwide criminal records check. * * * Upon the discovery of any disqualifying information as defined in accordance with the rule promulgated by the director, the bureau of criminal identification of the state police or the local police department will inform the applicant in writing of the nature of the disqualifying information, * * * [or] that an item of disqualifying information has been discovered. The employer will maintain on file, subject to inspection by the department, evidence that criminal records checks have been initiated on all employees seeking employment after August 1, 1985, and the results of the checks."

Further, the certification act authorizes the DCYF director to promulgate rules and regulations to carry out the intent of the act. *See* § 40–13.2–7. To that end DCYF developed policy Nos. 806 and 232.[2]

Policy No. 806 mandates criminal-records checks for "any person seeking to operate a residential care facility, day care center, or family day care home which is licensed or certified by" the DCYF, and it further requires the operators of such facilities to make certain that "all persons who are offered employment in positions which involve supervisory or disciplinary power over a child(ren), or involve routine contact with a child(ren) without the presence of other employees * * * receive nationwide criminal records checks." Criminal-records checks are required not only for prospective employees but also for volunteers and consultants in such positions. The policy states that disqualifying information is grounds "for denying or revoking a license or certification" and that "[i]n the case of employees/potential employees of home day care providers, it is grounds for denial of employment or termination." An appeal process is available for those individuals who have been denied licenses or certifications or whose certifications have been revoked, in which event a DCYF hearing officer will "rule on the ap-

---

**2.** Policy No. 232 is codified largely verbatim as DCYF regulation No. 111. *See* 12 Code R.I. Regs. 03–170–111.

peal based on the individual's" record of excellence in child care.

Domestic assault, one of Howie's criminal convictions, is considered disqualifying information by DCYF. The hearing officer for Howie's appeal found that Howie's conviction for domestic assault was dispositive, reasoning that:

> "[t]hese charges, which are a matter of record, preclude Mr. Howie from working in a position in any institution in the State of Rhode Island that would require him to have supervisory or disciplinary power over children or involve routine contact with children without the presence of other employees."

However, the arbitrator found otherwise. He interpreted the termination language of policy No. 806 to be inapplicable to Howie because it applied only to licensed child-care-facility operators or applicants and to their probationary employees who are hired pending completion of their criminal-records check.

Policy No. 232 calls for criminal records checks for prospective employees of the training school and juvenile diagnostic center. It requires criminal-records checks for prospective employees, volunteers, and consultants of the training school whose positions involve routine contact with juveniles without the presence of other employees. Disqualifying information is grounds for termination of employment under policy No. 232 also. However, an appeal is possible, and judgment will depend, again, on review of the prospective employee's overall record of excellence in providing child care.

Here the arbitrator decided that the certification act did not apply to Howie because the act "only applies to individuals who are seeking employment." Furthermore he decided that current employees are not covered by either policy, especially No. 232, which is replete with references to "prospective employees." The arbitrator reasoned that it would be a "simple matter" for DCYF to promulgate a rule or policy establishing off-

duty criminal activity as grounds for termination of its existing employees, and an employee would then be mindful of the consequences to his or her DCYF-employment career before entering into a plea-bargaining arrangement.

The arbitrator then went on to decide that because "[t]he Department did not promulgate any policy or rule covering employees' off-duty conduct * * * there is no need to discuss this aspect any further." Also he reasoned that even if DCYF's policies were applicable to Howie, the department failed to follow the necessary procedures by balancing Howie's prior employment history with his criminal record before terminating his employment. For these reasons the arbitrator decided that Howie had been discharged without just cause.

After examining the record in this case, we conclude that the arbitrator exceeded his powers for several reasons. Initially he manifestly disregarded the plain terms of the certification act and DCYF's policies in determining that DCYF did not promulgate any policy or rule covering its employees' off-duty conduct. In fact, all the disqualifying information limned in DCYF's policies relates to and includes off-duty conduct by prospective or existing employees. For example, murder, kidnapping, domestic assault, incest, and prostitution are all listed as disqualifying information in the addendum to policy No. 232; and all are examples of criminal misconduct that typically occurs off duty while employees are not actually at work.

Next the arbitrator criticized DCYF for not considering Howie's prior employment history in reaching his decision. However, consideration of an employee's past performance and written references is part of the administrative-appeal process for conviction-related disciplinary action. Under DCYF regulations, the employee bears the burden of establishing that his or her prior work record outweighs his criminal convictions, thereby allowing DCYF in its discretion to opt for retention instead of termination.[3]

---

**3.** Those regulations provided, in pertinent part, that "[w]ithin ten (10) working days of submission of [an employee's notice of appeal contesting DCYF's written notification of termination],

the employee must provide written references attesting to the employee's longstanding record of excellence in child care. * * * *If the employee has not demonstrated a record of excellence in*

But in this case Howie voluntarily chose not to participate in any administrative hearing leading to DCYF's termination decision. By failing to participate in this hearing process, Howie failed to carry his burden of demonstrating why his work record should outweigh his criminal convictions. Thus the arbitrator exceeded his powers in faulting DCYF for failing to consider Howie's work record when under the applicable regulations Howie had the burden of demonstrating to DCYF that his allegedly stellar child-care-work record so outweighed his criminal convictions that DCYF should exercise its discretion in favor of retention over termination.

■ The concurring and dissenting opinion suggests that because "DCYF did not take any action against Howie until a reporter inquired, at which point termination proceedings began[,] Howie is entitled to know why." We disagree. Howie had no right to know why DCYF took as long as it did to fire him after he was convicted of violent crimes during his employment with the department. Even if certain DCYF officials tarried because they considered Howie to have been an excellent employee and were therefore reluctant to terminate him until a reporter got wind of his convictions, DCYF's delay in terminating Howie could not be relied upon to override its "basic obligation to promote, safeguard and protect the social well-being and development of children" and to make provisions and arrangements to "care for each child under the [state's] supervision." See G.L.1956 §§ 42–72–2(2), 42–72–4(12), 42–72–4(14). Just as DCYF's statutory responsibilities to safeguard the children in its custody cannot be negotiated away at the bargaining table,[4] so too are they incapable of being lost or frittered away through delay, inaction, or even deliberate disregard of duty

by certain of its employees. *Cf. State Department of Mental Health, Retardation, and Hospitals v. Rhode Island Council 94, AFSCME, AFL–CIO*, 692 A.2d 318, 325 (R.I. 1997) ("[a]lthough the state may have allowed (and perhaps even benefited from) this past practice of letting its health-care employees volunteer for as many consecutive overtime hours as they wished to accumulate, its statutory right and obligation to take steps that will promote the welfare and the comfort of its patients and to provide for the protection of the public's health cannot be sacrificed on the altar of its earlier inaction").

■ Thus even if DCYF officials like those Howie sought to question had initially decided that, notwithstanding his convictions, he should be retained as an employee because of his exemplary work record, Howie could not use such a fact to prevent DCYF from ultimately terminating him after his convictions became public knowledge because such a result would frustrate DCYF's paramount statutory obligation to protect the children in its custody from violent criminals like Howie. Hence such evidence was in fact legally irrelevant and immaterial because it could not possibly have been used by Howie to compromise or to negate DCYF's supervening legal responsibilities in this situation.

In reviewing the decision of the arbitrator, the Superior Court decided that the arbitrator followed the proper procedure in considering whether DCYF had just cause to terminate Howie. The reviewing justice reasoned that it was plausible for the arbitrator to have concluded that neither DCYF's policies nor the certification act applied to current DCYF employees like Howie because they literally cover only prospective DCYF employees. The reviewing justice scrutinized the act and DCYF's poli-

---

*child care sufficient to warrant disregard of the otherwise disqualifying information, the Department Administrative Hearing Officer will uphold the termination."* (Emphasis added.) Here Howie failed to provide the written references required by DCYF's regulations and failed to demonstrate to the hearing officer a record of excellence in child care sufficient to warrant DCYF's disregarding his convictions and retaining him as an employee.

4. *See Vose v. Rhode Island Brotherhood of Correctional Officers*, 587 A.2d 913, 915 (R.I.1991) (holding that a department of state government lacked the authority to bargain away the statutory powers of its director and that a collective bargaining agreement purporting to restrict the director's authority to implement mandatory involuntary overtime was invalid); *see also Rhode Island Laborers' District Council v. State*, 592 A.2d 144, 146 (R.I.1991) ("there are limits to the extent that a statutory power and responsibility might be bargained away in a labor contract").

cies and found that they had been carefully drafted to omit any reference to all categories of DCYF employees who work closely with children. Thus he reasoned that the General Assembly did not intend for this statute to serve as a vehicle to protect children from current employees:

> "This award does not preclude the likelihood that a current employee guilty of some criminal offenses may be terminated for just cause on the basis of the criminal misconduct apart from the conviction, if that misconduct relates to DCYF's legal charge to protect certain children. The Agreement gives the State wide latitude to determine what off-duty misconduct constitutes just cause to dismiss an employee. The basis for the dismissal, however, will be subject to an arbitrator's interpretation of applicable provisions within the contract and of 'the common law of the workplace.' In this case, the arbitrator remained within his authority in interpreting the contract to find that the State did not have just cause to terminate Mr. Howie, because of his conviction, standing along [sic], without reference to the facts underlying his conviction."

The central and dispositive issue here is whether DCYF had just cause to terminate Howie despite the seemingly limiting language of the act and of DCYF policy Nos. 806 and 232. In our judgment both the arbitrator and the reviewing justice got so lost in the regulatory trees of this dispute that they failed to see the forest of just cause supporting DCYF's termination decision. As the reviewing justice recognized, under the CBA and pursuant to its basic statutory obligation to "care for each child under [its] direction," see § 42–72–4(14), DCYF possesses wide latitude to control and manage its operations vis-a-vis the custodial children in its care. Article 4 of the CBA contains a management-rights section whereby the union recognizes that "all rights to manage, direct or supervise the operation of the State and the employees are vested solely in the State." This section further states that DCYF—"subject to the provisions of this agreement and consistent with the applicable laws and regulations"—shall have, among others, the exclusive rights:

> "B. To hire, promote, transfer, assign, and retain employees in positions within the bargaining units and *to* suspend, demote, *discharge, or take other disciplinary action against such employees;*
>
> " * * *
>
> "E. *To relieve employees from duties because of lack of work or for other legitimate reasons.*" (Emphases added.)

We first observe that the CBA language quoted above is not meant to limit DCYF's power to discharge or to relieve its employees from their duties only in situations involving preemployment misconduct. This CBA management-rights provision gives DCYF the right to evaluate the conduct of its current employees and to determine whether it has just cause to terminate any one or more of them or to "relieve employees from duties" for "legitimate reasons." Such reasons surely include the protection of the children in its custody. By focusing solely on the certification act and DCYF's implementing regulations, the arbitrator's reasoning manifestly disregarded these management and discharge provisions of the CBA—none of which required DCYF to promulgate any rules or regulations pertaining to its existing child-care employees before they could be discharged for committing violent crimes.

Article 24.1 of the CBA provides that "[d]isciplinary action may be imposed upon an employee only for just cause." Although the CBA does not define what constitutes just cause, a DCYF child-care employee's convictions for certain kinds of criminal misbehavior, including the types of criminal acts listed as disqualifying information in DCYF's policies, would certainly constitute actions that fail to conform to the minimum standards of conduct that DCYF would have the right to expect of its supervisory child-care employees—even though they were not actually at work when such acts were committed. *See Bunch v. Board of Review, Rhode Island Department of Employment and Training,* 690 A.2d 335, 338 (R.I.1997). And nothing in the CBA or the certification act indicates that convictions for violent crimes like those Howie committed could not legitimately be

considered by DCYF as just cause for termination.

In *Bunch* this Court recently addressed a situation involving a supervisory DCYF employee's criminal misconduct involving her off-duty possession of illegal drugs. In that case we considered whether the employee's criminal acts constituted proven misconduct for purposes of denying unemployment-compensation benefits. The employee was DCYF's superintendent of the training school when the police discovered she possessed cocaine and drug paraphernalia at her home. We reasoned that the conduct underlying the employee's criminal misconduct (that is, her illegal use and/or possession of cocaine, even when she was not then at work) violated the standards of behavior that DCYF had a right to expect from its supervisory child-care employees. Therefore, we held that such off-duty criminal acts constituted proven misconduct that was properly considered to be job related. *Id.* at 337–38. As a result we held that the discharged employee was not entitled to collect unemployment-compensation benefits. *Id.* at 337.

■ Accordingly, if a supervisory DCYF child-care employee who was discovered to be in possession of illegal drugs—not while she was working but when she was at home—is thereby guilty of proven job-related misconduct warranting not only her discharge but the denial of unemployment compensation, then *a fortiori* a DCYF employee with child-care responsibilities who commits one or more violent crimes is also dischargeable for just cause. The mere fact that the certification act and DCYF's policies are directed primarily to applicants for employment rather than to existing employees does not mean that DCYF is powerless to terminate any of its existing child-care workers if it otherwise has just cause to do so.

Indeed, a contrary conclusion would be irrational; it would mean that DCYF would be required to retain in its employ convicted child molesters, batterers, pornographers, sadists, torturers, murderers, and others of this criminal ilk merely because they committed their crimes after having become DCYF employees (while they were off duty but still working for DCYF) rather than before they began their DCYF employment. In our judgment such an illogical interpretation of the just-cause provision of the CBA would not even be passably plausible, much less rational. It would prevent the state from firing Dr. Jeckyl because, after all, he only became Mr. Hyde after he left work for the day.[5] Thus it goes without saying that just because a DCYF child-care worker has committed one or more violent crimes while off duty from work does not mean that DCYF is powerless to terminate that employee for such misconduct.

Moreover, the arbitrator's decision to reverse DCYF's just-cause determination was the very type of substitution for management's judgment that we deemed in excess of an arbitrator's powers in *Rhode Island Laborers' District Council v. State*, 592 A.2d 144 (R.I.1991). There the CBA between a union of judicial employees and the state acknowledged that the chief judge of the District Court had the power to manage the operations of the court, including the right to "discipline or discharge for just cause." *Id.* at 144. The District Court's chief judge had discharged a supervisory deputy clerk responsible for personnel matters for various instances of flagrantly insubordinate behavior. *Id.* at 145. We concluded that by modifying the employee's discharge and ordering

---

**5.** Our conclusion that the arbitrator reached an irrational result is bolstered by the fact that his interpretation of the CBA contravenes DCYF's "basic obligation to promote, safeguard and protect the social well-being and development of children" and to make provisions and arrangements for "suitable treatment, rehabilitation, and care for each child under the [state's] supervision." *See* G.L.1956 §§ 42–72–2(2), 42–72–4(12), 42–72–4(14). *Cf. State Department of Mental Health, Retardation, and Hospitals v. Rhode Island Council 94*, 692 A.2d 318, 322 (R.I.1997) (*MHRH*). Just as we determined in *MHRH* that allowing an arbitrator to decide whether government hospital employees should be permitted to work unlimited overtime would violate the statute empowering MHRH to ensure the general welfare and comfort of MHRH's custodial patients, so too would an arbitration award that required DCYF to employ criminals convicted of violent crimes as government child-care employees violate the state's statutory policy empowering DCYF to safeguard the children in its care.

his reinstatement with back pay, interest, benefits, and restored seniority, the arbitrator thereby "substituted his judgment for that of the chief judge on the penalty to be imposed" and thus manifestly disregarded the CBA in contravention of his statutory powers. *Id.* at 146. Similarly the arbitrator in the case at bar substituted his judgment for that of the DCYF director in regard to the choice of job sanction for Howie's convictions for violent crimes. In doing so, the arbitrator was in manifest disregard of the CBA's contract language vesting DCYF's management with the right to discharge employees for just cause and of the DCYF's basic statutory obligation to "safeguard and protect the social well-being and development of children" under its care and supervision. *See* §§ 42–72–2(2), 42–72–4(14).

■ The dissenting and concurring opinion agrees that in this case the arbitrator reached an irrational result, exceeded his powers, and disregarded both DCYF's statutory obligations and its regulatory policies "regarding the department's own responsibilities once it discovers disqualifying conduct by a licensed child-care worker, including one of its own employees." Nonetheless, it contends that we should remand this case to the arbitrator so that he can balance Howie's work record against his postemployment disqualifying conduct. Our response to this suggestion is merely to ask: To what end? Should the arbitrator be allowed another opportunity to reach the same irrational result because he believes on balance that Howie's excellent work record trumps DCYF's statutory responsibility to protect the children in its care from violent criminals like Howie? Should we give the arbitrator the opportunity to conclude that DCYF was estopped from firing Howie because it initially decided to retain him and only changed its mind later when a reporter learned of his convictions? Because we believe that such a result would be no more rational, no more within the arbitrator's powers, and no less in disregard of DCYF's statutory responsibilities than the present award, we decline to engage in such a bootless exercise. Moreover, in our judgment, such a remand would impermissibly give the arbitrator free reign to conduct an independent investigation of Howie's work

record notwithstanding Howie's failure to carry his burden of proof before the administrative hearing officer as required by DCYF regulations. *Cf. Rhode Island Brotherhood of Correctional Officers,* 707 A.2d at 1234 (arbitrator's interpretation of CBA may not contravene state law or other public policies). The mere fact that DCYF regulations purport to give the department the power to retain an employee who has "demonstrated a record of excellence in child care sufficient to warrant disregard of the otherwise disqualifying information" does not mean that an arbitrator has the legal power to override a DCYF decision not to exercise that discretion when, as here, the employee failed to introduce any evidence before the hearing officer concerning his alleged "record of excellence in child care" and when, as here, such a result would jeopardize DCYF's ability to fulfill its statutory and regulatory duties to safeguard the children in its custody.

For these reasons we hold that the arbitrator exceeded his powers because his decision disregarded the management section of the CBA, flouted DCYF's statutory child-care duties, and thereby reached an irrational result. As a result the Superior Court should not have confirmed this untenable award.

### Conclusion

The appeal of DCYF is sustained, the Superior Court's judgment and the arbitrator's award are vacated, and the case is remanded to the Superior Court for entry of judgment in favor of DCYF.

GOLDBERG, Justice, concurring in part and dissenting in part.

I concur in the result reached in this case and agree with the majority's conclusion that the arbitrator reached an irrational result, exceeded his powers, and disregarded both G.L.1956 § 40–13.2–5 and the Department of Children, Youth and Families (DCYF or the department) policies regarding the department's own responsibilities once it discovers disqualifying conduct by a licensed child-care worker, including one of its own employees. I also agree with the Court's conclusion that the Certification of Child Care Personnel Act

(act) must be construed to apply to both present and future employees of DCYF who are subject to termination from service upon the discovery of a disqualifying event. Consequently I agree with the holding of the majority that DCYF's policy Nos. 806 and 232 relating to disqualification of individuals pursuant to the act are applicable to this case. I write separately, however, because I am of the opinion that DCYF must comply with its own policies.

In this case the record reveals that DCYF did not properly follow the policy provisions entitling defendant Maurice Howie (Howie) to have his "prior employment history balanced against the disqualifying information." The arbitrator found, and I agree, that although DCYF sought to apply the statute and the policies to Howie, "it never gave any consideration to the * * * procedure for balancing grievant's prior record against his conviction on domestic assault." I am of the opinion that this failure alone necessitates a remand of this case to the Superior Court with directions to vacate the arbitration award and to provide instructions for the arbitrator to consider the applicability of all policies in their entirety. This remand includes permitting Howie the opportunity to demonstrate "a record of excellence in child care sufficient to warrant disregard of the otherwise disqualifying information," as both policy Nos. 806 and 232 contemplate. I recognize that Howie may very well be unable to satisfy such a standard in the face of his record, but nevertheless both policies clearly mandate that Howie should be given the opportunity to do so.

Indeed the written decision of the administrative hearing officer reflects an attempt by Howie at the initial grievance hearing to procure the attendance of the former associate director for juvenile services, as well as an attempt to obtain documents relating to Howie's imprisonment and other types of documentation. These requests were denied by the hearing officer after DCYF's legal counsel objected on the ground that the materials were not relevant to DCYF's request for an administrative hearing. Howie, however, asserted that the former associate director for juvenile services would have infor-

mation concerning the reasons DCYF did not take any action against him from June 1991 until March 1992. The department responded that this offer of proof did not constitute a valid defense to its request for an administrative hearing under the terms of the collective bargaining agreement (CBA) and its objection was sustained *on the grounds of materiality.* It was only at this point that the union representative advised Howie that he and the union should not continue to participate in the hearing. Thus I disagree with the majority's conclusion that Howie "voluntarily chose not to participate in any administrative hearing leading to DCYF's termination decision" and that he "failed to carry his burden of demonstrating why his work record should outweigh his criminal convictions." The record simply belies this very conclusion.

I also disagree with the majority's conclusion that Howie's attempts to present this evidence was "apparently for the purpose of pursuing some sort of estoppel theory rather than to demonstrate that Howie's excellent work record justified his continued DCYF employment." The arbitrator's decision recites the union's position that DCYF was well aware of Howie's disqualifying conduct as early as 1991 and that despite this fact, DCYF chose not to commence termination proceedings at that time. This fact gives rise to the reasonable inference that "discretion was exercised in grievant's favor since there was a three page memorandum written by Mr. Mastrangelo [the witness determined to be irrelevant] to Mr. Bohan [the then-executive director of DCYF] in June 1991 informing Mr. Bohan of the details of grievant's situation." Accordingly I disagree that this evidence was intended for "some sort of estoppel theory," and even if it were intended for this purpose, I still cannot agree that it was immaterial. Estoppel may very well have been relevant in the context of this case and pursuant to the CBA. It remains undisputed that DCYF did not take any action against Howie until a reporter inquired, at which point termination proceedings began. Howie is entitled to know why.

Moreover, everyone at that hearing, including DCYF, was operating under the

provisions of the CBA, which provide for arbitration at the request of either party. Having elected to proceed pursuant to the terms of the CBA, DCYF should not now be permitted to change the rules, nor should Howie be penalized for exercising his rights under the CBA and proceeding directly to arbitration. This finding is especially appropriate since DCYF instituted this termination proceeding through the provisions of the CBA.

I also respectfully disagree with the majority's conclusion that Howie failed to submit any evidence of his outstanding work record to the arbitrator. The issue presented to the arbitrator read, "Was the grievant, Maurice Howie, discharged without just cause? If so, what shall be the remedy?" Since the arbitrator proceeded to find that neither the act nor the policies were applicable to an existing employee, the arbitrator determined that Howie was discharged without just cause. The arbitrator never passed upon Howie's record of exemplary employment and he certainly made no findings that Howie had failed to introduce evidence relevant to his employment record. Nor should we. Moreover, the arbitrator summarized the evidence presented to him, including two performance evaluations in which Howie was rated good or excellent in all categories and observed that Howie "had proved to be a satisfactory employee in all respects." Furthermore, the record discloses that Howie did in fact present evidence. Howie presented the testimony of Bohan who acknowledged receiving the June 1991 memorandum concerning criminal charges pending against Howie. Bohan stated, however, that the memorandum could not be found and that DCYF had made no effort to ascertain the final disposition of the criminal charge. I therefore disagree with the conclusion of the majority that Howie failed to introduce any evidence that would have allowed the arbitrator to balance his work record against his postemployment disqualifying conduct. Having concluded that the act and the policies were inapplicable, the arbitrator reasoned that balancing was unnecessary. The arbitrator also found that since DCYF did not promulgate a policy that covered an employee's off-duty conduct *"there is no need to discuss this aspect any*

*further."* (Emphasis added). Simply stated, the finder of fact did not reach this issue, and I am of the opinion that we should remand this case with instructions for the arbitrator to do so.

As the trial justice noted, it is undisputed that Howie maintained a good employment record during the entire term of his employment. It is equally undisputed that he was honest with his employer and kept DCYF informed of all criminal charges, including the fact that he was held at the Adult Correctional Institutions. The department, however, took no action against Howie until an inquiry was made by a journalist. Moreover, the termination proceedings taken by DCYF, although in accordance with the CBA, did not comply with policy Nos. 806 and 232. Here DCYF does not contend that it was entitled to act independently of the CBA, nor does it object to arbitration on the ground that this matter was not arbitrable. *See State v. Local No. 2883, AFSCME,* 463 A.2d 186, 191–92 (R.I.1983). The procedures outlined in policy Nos. 806 and 232, however, differ significantly from the grievance and arbitration provisions of the CBA where the focus is on determining whether the employee was terminated for just cause. *See generally Rhode Island Brotherhood of Correctional Officers v. State,* 643 A.2d 817 (R.I.1994); *Council 94, AFSCME v. State,* 475 A.2d 200 (R.I.1984).

As the trial justice observed, DCYF's ability to discharge an employee is "subject to the limitations specified in the [a]greement itself. Articles 24, 25, and 26, which give a party aggrieved by a termination the right to a hearing before an arbitrator, is just such a limitation."

Thus, notwithstanding the applicability of the act and the policies adopted pursuant thereto, which we have determined to be binding upon the parties and the arbitrator, DCYF has yet to afford Howie the opportunity to overcome the *discretionary* discharge decision. As the trial justice so aptly noted:

"Even if the regulations did cover current employees, the arbitrator could have applied the reasoning provided in the regulations to overturn Mr. Howie's dismissal through his demonstrated record as an

excellent employee at the Training School. If the employer has discretion in determining 'just cause' for dismissal of an employee before unqualified full employment on the basis of disqualifying information, the arbitrator may by the same token in his or her discretion conclude that just cause does not exist under these regulations as to an employee subject to a collective bargaining agreement."

Therefore, although I agree with the majority's conclusion that the act and the policies promulgated pursuant thereto apply to both current and prospective employees of DCYF, I do not believe that this finding concludes the matter. Accordingly I would remand this case to the Superior Court with instructions to vacate the arbitration award and direct the arbitrator to render an award consistent with the act and DCYF policies.