S91A0295. MARTA v. LOCAL 732, AMALGAMATED TRANSIT UNION.

(403 SE2d 51)

SMITH, Presiding Justice.

This is an appeal from an award of summary judgment upholding arbitration findings in a labor dispute. We affirm.

This case involves issues of both grievance arbitration and interest arbitration.[1] The grievance arbitration issue concerns whether the appellant, Metropolitan Atlanta Rapid Transit Authority (MARTA), should be compelled to submit certain grievances to arbitration pursuant to its labor agreements with the appellee, Local 732 of the

---

[1] Section 20 (b) (2) (C) of Ga. L. 1965, p. 2243 et seq., as amended by Ga. L. 1986, p. 3761 (the MARTA Act), defines grievance arbitration as:
 arbitration of a dispute between [MARTA] and [the Union] . . . which involves the interpretation of an existing labor agreement and the application of the terms and conditions of that labor agreement to the claims of one or more employees.
Section 20 (b) (2) (D) of the MARTA Act, supra, defines interest arbitration as:
 arbitration which determines or formulates, in whole or in part, the terms and conditions of a labor agreement between [MARTA] and [the Union], including the formulation of contract provisions governing wages, hours, and working conditions.

Amalgamated Transit Union (the Union). The Union filed grievances and sought arbitration against MARTA when MARTA decided to subcontract certain maintenance work to non-union employees and to use part-time drivers. Simultaneously, during negotiations over a new labor agreement, the Union sought interest arbitration of, among other things, these same issues.

MARTA objected to any arbitration of the subcontracting and part-time worker issues, asserting that it had unlimited rights in those areas under the MARTA Act, Ga. L. 1965, p. 2243 et seq., as amended. MARTA filed a petition for injunctive and declaratory relief seeking to enjoin the arbitration of the subcontracting issue. The Union answered and counterclaimed seeking an order compelling arbitration of the subcontracting and part-time worker issues. When the interest arbitrator entered a finding which included limits on MARTA's rights in those areas, MARTA sued to vacate those portions of the interest arbitration award dealing with subcontracting and use of part-time employees, claiming that the arbitrator exceeded his authority. On cross-motions for summary judgment the trial court denied MARTA's motion and granted summary judgment to the Union.

## Background

At the time the grievances arose, MARTA and the Union were parties to a collective bargaining agreement (the Labor Agreement) which provided for a grievance and arbitration procedure to resolve disputes which occurred concerning the interpretation, application or conditions of the Labor Agreement. Additionally, MARTA and the Union are parties to another agreement known as a "Section 13 (c)" Agreement. The Section 13 (c) Agreement is so called because it is intended to comply with Section 13 (c) of the Urban Mass Transportation Act (UMTA), 49 USCA 1609 (c), which provides that in order for public transit authorities such as MARTA to receive federal funds they must provide labor protections to their employees including the continuation of the right to collectively bargain.[2] Thus a Section 13

---

[2] Section 13 (c) of the Urban Mass Transportation Act of 1964, 49 USCA § 1609 (c) (1982) stipulates that, before federal funds may be awarded to a formerly private but presently publicly owned transit system, the Secretary of Labor must certify that the transit authority has made a fair and equitable labor protective arrangement that includes, among other things, provisions ensuring employees of the "continuation of collective bargaining rights." *Amalgamated Transit Union v. Donovan*, 767 F2d 939 (D.C. Cir. 1985). Section 13 (c), supra, reads in full:

It shall be a condition of any assistance under section 1602 of this Appendix that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be nec-

(c) Agreement which is approved by the U. S. Secretary of Labor is a prerequisite to MARTA's receipt of federal funds. Like the Labor Agreement, the Section 13 (c) Agreement contains arbitration provisions. Finally, Section 20 (b) (10) of the MARTA Act provides:

*Subject to any requirements imposed pursuant to Section 13 (c) of the Urban Mass Transportation Act of 1964, as amended,* the Authority at all times shall have the right to determine the method, means and personnel by which its operations are to be carried on, including the right to hire part-time employees. (Emphasis supplied.)

## Discussion

1. MARTA contends that under Section 20 (b) (10) it is not required to submit subcontract or part-time employee issues to either grievance or interest arbitration because it has absolute rights in those areas which cannot be restricted by labor agreements or arbitration. We disagree. Section 20 (b) (10) was incorporated into the MARTA Act following the ruling in *Amalgamated Transit Union v. Donovan,* 767 F2d 939 (D.C. Cir. 1985). That case held that MARTA was not entitled to continue receiving federal assistance because (at that time) the MARTA Act did not provide for meaningful collective bargaining. In response to the ruling in *Donovan,* the General Assembly amended the MARTA Act to include, among other things, Section 20 (b) (10), supra.

Prior to the amendment, the MARTA Act had specifically allowed MARTA to hire part-time employees and to subcontract services, except for bus operators, without regard to collective bargaining

essary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) *the continuation of collective bargaining rights;* (3) *the protection of individual employees against a worsening of their positions with respect to their employment;* (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 11347 of title 49. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements. (Emphases supplied.)

Prior to 1971, mass transportation in the Atlanta metropolitan area was provided by Atlanta Transit System (ATS), a private transit company. As such ATS was covered by the National Labor Relations Act and its workers enjoyed the rights protected by the statute. In 1965, the General Assembly created MARTA, a public corporation authorized to purchase and operate the mass transit system run by ATS. In 1971, MARTA applied to the federal government for funding under the UMTA in order to purchase and operate ATS. That action brought MARTA under the purview of Section 13 (c), supra.

agreements or arbitration awards. The General Assembly's purpose in enacting Section 20 (b) (10) was to make certain that MARTA complied with Section 13 (c) of the UMTA in order for MARTA to retain eligibility for federal funding. Given that history, it does not seem reasonable that in amending the old law in order to give MARTA employees more meaningful collective bargaining rights, the General Assembly intended to grant MARTA greater rights to subcontract and utilize part-time employees than it previously had.

Additionally, in *Donovan*, supra, the United States Court of Appeals for the District of Columbia held that, under Section 13 (c) of the UMTA, MARTA employees, "are entitled to be represented in meaningful, 'good faith' negotiations with their employer over wages, hours and other terms and conditions of employment." 767 F2d at 951. MARTA contends that Section 13 (c) does not require it to bargain over subcontracting matters because the court cases are unclear as to whether subcontracting is a mandatory subject of collective bargaining under the National Labor Relations Act, and because Section 20 (b) (10) gives it unlimited rights to use part-time employees. If MARTA, as it asserts, has such unfettered authority over its use of subcontractors and part-time employees, then it could replace its entire work force with subcontractors or replace all its full-time employees with part-time employees. Clearly, such absolute authority over the use of subcontractors and part-time employees would affect the wages, hours, and other terms and conditions of employment of full-time employees to such an extent that the meaningful and good faith negotiations envisioned by Section 13 (c) of the UMTA or the Section 13 (c) agreement could not exist.

It is inconceivable that the General Assembly intended to grant to MARTA such wide discretion. While MARTA may use subcontractors and part-time employees, that right is not absolute. It is only reasonable, considering the totality of the circumstances leading up to the creation of Section 20 (b) (10), that the General Assembly intended for MARTA to comply with the mandates of the UMTA. That includes being subject to reasonable restrictions in its use of subcontractors and part-time workers through its labor agreements, or through the authority of an interest or grievance arbitrator.

Consequently, we hold that Section 20 (b) (10) of the MARTA Act does not give MARTA the unlimited right to subcontract and to employ part-time workers, but rather stands for the proposition that MARTA's authority in those areas may be restricted through collective bargaining and arbitration awards.

2. (a) MARTA asserts that the interest arbitrator exceeded his authority and the trial court erred in not vacating the hiring limitation imposed by the interest arbitration award. MARTA cites *Local 589, Amalgamated Transit Union v. Mass. Bay Transp. Auth.*, 392

Mass. 407 (467 NE2d 87, 91) (1984), for the proposition that, "[a]n arbitrator exceeds his authority where his award requires conduct by a public employer beyond that to which the public employer may bind itself or allow itself to be bound." It is MARTA's contention that Section 20 (b) (10) grants it unrestricted rights to use part-time employees; therefore the arbitrator's decision to limit the number of part-time workers to 33 ⅓ percent of the number of full-time employees in any respective classification causes MARTA to bind itself in contradiction to and beyond the scope of the MARTA Act.

We disagree. "An arbitrator has inherent power to fashion a remedy as long as the award draws its essence from the contract or statute." *American Federation of States, County, &c. v. State*, 475 A2d 200 (R.I. 1984). As noted above, Section 20 (b) (10) subjects MARTA to the provisions encompassed within Section 13 (c) of the UMTA. Along with the protection of the "continuation of collective bargaining rights," Section 13 (c) (2), the UMTA also provides for "the protection of individual employees against a worsening of their positions with respect to their employment." UMTA Section 13 (c) (3). While we decline to read this language as absolutely preventing MARTA from using part-time employees, we also refuse to ignore these provisions to an extent that would grant MARTA unbridled discretion to hire part-time workers.

(b) MARTA also argues that the arbitrator exceeded his authority because there is no statutory or contractual language which compels it to arbitrate over the use of subcontractors or part-time workers. MARTA contends that those issues are subjects of permissive bargaining rather than mandatory bargaining; therefore, because *Donovan*, supra, limits its requirement for meaningful and good faith bargaining to disputed mandatory subjects,[3] the interest arbitration concerning those issues is void.

This argument misses the point. Our task here is to construe the meaning and application of the MARTA Act not merely to apply *Donovan*. As noted in *Local 589, Amalgamated Transit Union v. Mass. Bay Transp. Auth.*, 467 NE2d 87, supra at 91, "whether the challenged provisions of the award are unenforceable as beyond the arbitrator's authority is a matter of legislative intent." Thus, while *Donovan* is instructive as to the process by which the General Assembly came to adopt Section 20 (b) (10), it is the intent of the legisla-

---

[3] This is not entirely accurate. While *Donovan* does not extend to permissive bargaining issues, it was litigated, in part, because the General Assembly had passed an amendment to the MARTA Act (Act 1506, Section 3 (b) (2), Ga. L. 1982 at p. 5104) which prohibited MARTA from bargaining over five subjects: the assignment of employees, discharge and termination of employees for cause, *subcontracting of work*, fringe benefits for part-time employees, and assignment and calculation of overtime. Thus *Donovan*, does directly deal with the use of subcontractors.

ture that determines the scope of the arbitrator's authority.

Under the terms of the MARTA Act, an interest arbitrator is charged with devising an agreement "which determines or formulates, in whole or in part, the terms and conditions of a labor agreement between [MARTA] and [the Union], including the formulation of contract provisions governing wages, hours, and working conditions." MARTA Act, Section 20 (b) (2) (D). As noted in Division 1 of this opinion, MARTA's use of part-time employees and subcontractors directly affects the wages, hours, and working conditions of the full-time workers. Likewise, MARTA's ability to use part-time workers and subcontractors without restriction would effectively nullify the collective bargaining rights of full-time employees. To allow that to occur would directly contradict Section 20 (b) (10) of the MARTA Act. Thus the arbitrator was clearly within his authority to compel interest arbitration of these issues.

Similarly, the trial court did not err in upholding the arbitrator's authority to compel grievance arbitration. MARTA has both a statutory and a contractual duty to arbitrate all disputes concerning the interpretation, or application of both the Labor Agreement and the Section 13 (c) agreement. Section 20 (b) (2) (C) of the MARTA Act, Ga. L. 1965 at p. 2243 et seq. as amended by Ga. L. 1986 at p. 3761, provides:

'Grievance arbitration' means arbitration of a dispute . . . which involves the interpretation of an existing labor agreement and the application of the terms and conditions of that labor agreement to the claims of one or more employees.

Section 20 (b) (3) of the MARTA Act states:

Every labor agreement entered into by [MARTA] shall provide for grievance arbitration and shall specify the procedure therefor. . .

The Labor Agreement provides for grievance arbitration thusly:

If, . . . any disputes arise between MARTA and the Union, or its members, as to the interpretation, meaning or application of any provision of this agreement over which they cannot agree, the same may be submitted to a Board of Arbitration.

Finally, the Section 13 (c) agreement also provides for arbitration of any, "labor dispute or controversy regarding the application, interpretation, or enforcement of any of the provisions of [that] Agreement."

MARTA urges that it is not compelled to arbitrate the Union's grievances because the labor agreements do not specifically address

subcontracting. However, issues regarding the application or interpretation of the labor agreements are raised when decisions regarding subcontracting impact the provisions contained in those agreements. For example, Paragraph 120 of the Labor Agreement provides that rail-car maintenance will be performed by Union employees after the cars have been accepted by MARTA. MARTA sought to use subcontractors in the interior cleaning of rail cars. It is entirely reasonable that MARTA's use of subcontractors to clean the interior of rail cars created a dispute over the application, interpretation and enforcement of Paragraph 120 of the Labor Agreement, and the trial court acted properly in upholding the arbitrator's authority to arbitrate that and the other grievance issues.

*Judgment affirmed. All the Justices concur, except Fletcher, J., who concurs in the judgment only, and Bell, J., who dissents.*

DECIDED APRIL 17, 1991.

*Alston & Bird, G. Conley Ingram, W. Glenn Viers, Melinda K. Wells,* for appellant.

*Walls & Corlew; J. Michael Walls, Bromfine & Taylor, Douglas Taylor,* for appellee.