313 Ga. 19
FINAL COPY

S21G0008, S21G0015 ADVENTURE MOTORSPORTS
REINSURANCE, LTD. et al. v. INTERSTATE NATIONAL
DEALER SERVICES, INC. (two cases).

ELLINGTON, Justice.

We granted these petitions for a writ of certiorari to consider whether the Court of Appeals erred in reversing the trial court's order confirming an arbitration award against Interstate National Dealer Services, Inc. ("INDS"), in favor of Southern Mountain Adventures, LLC ("Dealer"), and Adventure Motorsports Reinsurance, Ltd. ("Reinsurer"). See *Adventure Motorsports Reinsurance v. Interstate National Dealer Svcs.*, 356 Ga. App. 236 (846 SE2d 115) (2021). The dispute arose from the parties' contractual relationship pursuant to which Dealer sold motorsports vehicle service contracts, which were underwritten and administered by INDS, to Dealer's retail customers, and Reinsurer held funds in reserve to pay covered repair claims. We conclude that the Court of Appeals erred in reversing the confirmation of the

award on the basis that the arbitrator manifestly disregarded the law in rendering the award. In Case No. S21G0015, we therefore reverse the Court of Appeals' decision reversing the order confirming the arbitration award on that basis, and we remand for resolution of INDS's argument that the arbitrator overstepped his authority in making the award. In Case No. S21G0008, we vacate the Court of Appeals' decision dismissing as moot Dealer and Reinsurer's appeal from the trial court's failure to enforce a delayed-payment penalty provided in the arbitration award, and we remand for reconsideration of that issue.

The record shows the following. Beginning in 2006, Mountain Adventures, LLC, a motorsports vehicle dealership owned by Ryan Hardwick, began selling INDS's after-market vehicle service contracts to the dealership's retail customers. Under its agreement with INDS (the "Program Agreement"), Mountain Adventures set the retail price paid by vehicle buyers for service contracts, remitted to INDS for each contract sold the "Contract Cost" listed in the "Dealer Net Price Schedule," which the parties called the "Rate

Card," and retained the difference as its "commission."[1]

INDS served as the administrator of the contracts, and an INDS-affiliated company served as the reinsurer. As an INDS executive testified at the arbitration hearing, out of the Contract Cost, INDS allocated an amount determined by its underwriters as the claims reserves for each contract (about 20 percent of the Contract Cost in an example that was the subject of testimony during the hearing). INDS also allocated an amount to itself for "administration." The rest of the Contract Cost went to pay commissions to the independent insurance agent who acted as the liaison between INDS and Mountain Adventures; to "non-claims reserves," which were used to fund a sales incentive program for the

---

[1] The Program Agreement provided:
>In consideration of the services rendered by [Mountain Adventures], [INDS] agrees to pay [Mountain Adventures] a commission equal to the amount of the retail price of Contract less Contract Cost as set forth in the Dealer Net Price Schedule. [Mountain Adventures] may retain its commissions from each sale before remitting Contract Cost to [INDS].

In the Program Agreement, Mountain Adventures agreed "to follow the underwriting and claims guidelines issued by [INDS] from time to time on forms supplied by [INDS]. Such guidelines will determine which vehicle/craft are eligible for use in [INDS's] Program(s)."

dealership's employees and to cover a roadside-assistance program that was included in all of INDS's vehicle service contracts; and to other purposes. When the term of a service contract expired, INDS shared with Mountain Adventures a portion of the underwriting profit (the difference between the claims reserves and repair claims paid under each service contract).

In 2008, another motorsports vehicle dealership owned by Hardwick, Southern Mountain Adventures ("Dealer"), entered into a different type of contract with INDS. Under this new arrangement, instead of the claims reserves being held by the INDS-affiliated company as the reinsurer, Adventure Motorsports Reinsurance, Ltd. ("Reinsurer"), a newly created entity also owned by Hardwick, would hold the claims reserves and would be entitled to all of the underwriting profit realized at the expiration of a service contract. The contract between Dealer and INDS (the "Producer Agreement") was like the previous arrangement between Mountain Adventures and INDS (the Program Agreement) in most respects: Dealer agreed to sell service contracts to its customers, setting the retail price at

4

its discretion, and to remit to INDS the Contract Cost listed on the Rate Card for each contract sold, and INDS agreed to administer the contracts and pay vehicle repair claims.[2] Under a related contract between INDS and Reinsurer (the "Reinsurance Agreement"), during the term of the service contracts sold by Dealer, Reinsurer would reimburse INDS for repair claims paid by INDS. The Reinsurance Agreement contained an arbitration clause, which provided, in part:

> The arbitrators [chosen by the parties] and umpire [chosen by the two arbitrators] shall interpret this Agreement as an honorable engagement and not strictly as a legal obligation. They are relieved of all judicial formalities, may abstain from following the strict rules of law, and shall make their award with a view to affecting the general purpose of this Agreement in a reasonable manner rather than in accordance with its literal language.

After the parties operated under this arrangement for about

---

[2] In the Producer Agreement, Dealer agreed to
[u]tilize the pricing structures, underwriting and claims guidelines issued by [INDS] from time to time on forms supplied by [INDS]. Such structures and guidelines will determine which vehicles are eligible for use in [INDS's] Program(s) as well as the required pricing, including reserves for claims.

five years, Hardwick learned that, contrary to his expectation, INDS was not remitting the entire Contract Cost listed on the Rate Card to Reinsurer as claims reserves for each service contract Dealer sold to a vehicle purchaser. INDS's position was that claims reserves, as determined by a third-party actuarial firm, constituted only a component of the Contract Cost of a service contract and that INDS was required under the Producer Agreement to remit only that component of the Contract Cost to Reinsurer. Dealer, Reinsurer, and INDS agreed to arbitrate their dispute. They executed an Arbitration Agreement, which reflected that Dealer and Reinsurer sought to recover from INDS damages "as a result of numerous disputes arising out of" the contracts among Dealer, Reinsurer, and INDS "regarding funds generated from sales of vehicle service contracts and subsequent administration of these funds and claims thereafter." The claimants, Dealer and Reinsurer, asserted claims for "breach of contract, fraudulent procurement of contract, and misrepresentation for unauthorized charges and fees, and misappropriated and unaccounted funds."

In the Arbitration Agreement, the parties agreed to a single arbitrator (rather than a panel of three, as agreed upon in the Reinsurance Agreement), and, in a subsequent consent case management order, they agreed "to proceed in accordance with the Commercial Arbitration Rules adopted by the American Arbitration Association and Supplementary Rules for the Resolution of Intra-Industry U.S. Reinsurance and Insurance Disputes." The parties also agreed that "[t]he Arbitrator may grant any remedy or relief that the Arbitrator deems just and equitable within the scope of the agreements of the Parties, including but not limited to monetary damages, statutory damages, and equitable, declaratory, or injunctive relief."

After an evidentiary hearing, the arbitrator found in favor of the claimants, Dealer and Reinsurer. The arbitrator considered the Producer Agreement (between Dealer and INDS) and the related Reinsurance Agreement (between Reinsurer and INDS) together as "the Reinsurance Arrangement Agreements." The arbitrator found that the Rate Card did not authorize INDS to recover or pay itself

any charges and fees and that the only purpose of the Rate Card was to establish Dealer's cost for vehicle service contracts that Dealer sold to its retail customers. The arbitrator found that the only charges and fees expressly authorized in any of the parties' agreements were "fees associated with contracts written"[3] and "warranty claims and claim adjustment expenses"[4] and that neither of these terms authorized INDS to recover and pay itself charges and fees for administration, agent's commissions, reserves for a sales incentive program for Dealer's personnel, reserves for roadside assistance claims, any claim adjustment expense in addition to those actually and reasonably incurred, or any premium tax in excess of

---

[3] In the Producer Agreement, Dealer agreed to

[a]uthorize [INDS] to receive from such remittance [of "appropriate monies due" INDS from sales of vehicle service contracts, i.e., the Contract Cost specified for a contract on the Rate Card], fees associated with contracts written, or if such remittances are insufficient for payment of same then, withdraw such amounts from funds in the reinsurance company formed by [Dealer] and previously remitted by [Dealer].

[4] In the Producer Agreement, Dealer agreed to

[a]llow [INDS] to be reimbursed from [Reinsurer] for payments it has made for any claims and claim adjustment expenses including, but not limited to, inspection and/or legal fees relating to the [vehicle service contract] or for cancellation of any [vehicle service contract].

the applicable state rate.

The arbitrator further found, based on testimony at the hearing, that a ceding fee is customarily paid to the administrator of a reinsurance program to cover costs and expenses anticipated to be incurred by the administrator of a reinsurance program. The arbitrator found that, contrary to that custom, the Reinsurance Agreement reflected that Reinsurer would pay no ceding fee to INDS as the administrator of the service contracts reinsured by Reinsurer. The arbitrator found, based on testimony at the hearing, that, in drafting the agreements, INDS was intentionally vague as to what portion of monies it received from Dealer would be ceded to Reinsurer.[5] The arbitrator noted that, "[u]nder Georgia law, where the governing contract is clear and unambiguous, the contract should be enforced according to its plain terms" and that any ambiguity in the governing contract should be "construed against the drafter (which was [INDS])." The arbitrator found that INDS

---

[5] Although the arbitrator found that INDS intentionally drafted the agreements to be vague, he expressly declined to make any finding as to Dealer and Reinsurer's claims of fraudulent inducement and misrepresentation.

prepared and delivered to Dealer and Reinsurer periodic operating statements that failed to specify the charges and fees it had retained before ceding the actuarially determined claims reserves to Reinsurer. Finally, the arbitrator found that INDS breached the agreements by unilaterally recovering and paying to itself and third parties charges and fees not expressly authorized in the agreements and not disclosed in operating statements.

The arbitrator awarded Dealer and Reinsurer more than $400,000 for "excessive" administration fees, "excessive" agent's commissions, and amounts allocated from the Contract Cost to other expenses. For the administration fees and agent's commissions, Dealer and Reinsurer proposed, and the arbitrator accepted, a "quantum meruit" calculation of the amounts charged minus the value of the services provided by INDS, based on the opinion testimony of a former president of INDS as to the industry average. In Section C (1) (g), the arbitration award provided:

> If this Award is not paid in full by [INDS] to [Dealer and Reinsurer] within 30 days of the date of the Award, [INDS] will be charged interest at an annual rate

prescribed under OCGA § 7-4-12 on the outstanding Award balance from the date of the Award until the Award is paid in full, plus reasonable costs of collection, including attorneys' fees, incurred by [Dealer and Reinsurer].

INDS filed a motion in the trial court to vacate the arbitration award under OCGA § 9-9-13 (b) (3) and (b) (5), and Dealer and Reinsurer filed a cross-motion for confirmation of the award under OCGA § 9-9-12. Dealer and Reinsurer also requested that the court hold an evidentiary hearing and make factual findings that INDS violated Section C (1) (g) of the arbitration award by not paying the amount awarded to Dealer and Reinsurer in full within 30 days of the date of the award. The trial court confirmed the arbitration award. But the trial court declined to address Section C (1) (g), based on its determination that issues about the delayed-payment penalty would not be ripe for decision until 30 days after entry of a final judgment confirming the award.

INDS appealed the order confirming the arbitration award, and Dealer and Reinsurer appealed the trial court's failure to enforce the delayed-payment penalty. The Court of Appeals reversed

the order confirming the arbitration award under OCGA § 9-9-13 (b)

(5). The Court of Appeals ruled that

> [n]either the Claimants [(Dealer and Reinsurer)] nor the arbitrator identified any amount paid to INDS outside of the prices reflected in the contracts and on the Rate Card, so this is not a case involving unreviewable factual errors. That INDS used those payments to run its business, pay its costs, and retain a profit is not a ground for eliminating the Claimants' contractual liability to pay INDS the prices listed on the Rate Card. The arbitrator's explicit rejection of the Rate Card as the contracted-for pricing ignores the express contractual language requiring the Claimants to "utilize the pricing structures" provided by INDS and transmit completed service applications "together with appropriate monies due [INDS] from" the Claimants' sales. Accordingly, by explicitly rejecting the contractual language, the arbitrator manifestly disregarded the law, and the superior court erred by confirming the award.

*Adventure Motorsports*, 356 Ga. App. at 240 (footnotes omitted). The court did not address INDS's alternative argument under OCGA § 9-9-13 (b) (3) that the arbitrator overstepped his authority in the way he interpreted the contracts and calculated the award. Based on the court's reversal of the order confirming the arbitration award, the court dismissed as moot Dealer and Reinsurer's argument that the trial court erred in failing to enforce the delayed-payment

12

penalty.

1. Dealer and Reinsurer contend that the Court of Appeals erred in reversing the trial court's order confirming the arbitration award under OCGA § 9-9-13 (b) (5), on the basis that INDS was prejudiced by the arbitrator's manifest disregard of the law. Specifically, Dealer and Reinsurer argue that, for vacatur on this basis, controlling precedent requires a showing of concrete evidence that the arbitrator intentionally and knowingly chose to ignore the law applicable to the parties' dispute, and they argue that such evidence is absent in this case. We agree.

Georgia's Arbitration Code "was designed to preserve and ensure the efficacy and expediency of arbitration awards." *ABCO Builders v. Progressive Plumbing*, 282 Ga. 308, 309 (647 SE2d 574) (2007).

> A primary advantage of arbitration is the expeditious and final resolution of disputes by means that circumvent the time and expense associated with civil litigation. . . . [A]rbitration is a unique procedure that exists in Georgia due to legislative fiat, and it is conducted in accordance

13

with the rules established by the legislature.

*Greene v. Hundley*, 266 Ga. 592, 597 (3) (468 SE2d 350) (1996). By agreeing to arbitrate grievances, contracting parties express their intent "to by-pass the judicial system and thus avoid potential delays at the trial and appellate levels." *Brookfield Country Club v. St. James-Brookfield, LLC*, 287 Ga. 408, 413 (1) (696 SE2d 663) (2010).

Under the Arbitration Code, trial courts are "severely limited in vacating an arbitration award so as not to frustrate the legislative purpose of avoiding litigation by resort to arbitration." *Brookfield*, 287 Ga. at 411 (1) (citation and punctuation omitted). See OCGA § 9-9-12 ("The [trial] court shall confirm an award upon application of a party made within one year after its delivery to him, unless the award is vacated or modified by the court as provided in [the Arbitration Code]."). In reviewing a trial court's order confirming or vacating an arbitration award, the appellate court reviews de novo the trial court's resolution of questions of law. See *Wells v. Wells-*

*Wilson*, 360 Ga. App. 646, 648 (860 SE2d 185) (2021).[6]

The Arbitration Code enumerates five grounds for vacatur, and those grounds are the exclusive means by which a court may vacate an arbitration award. See *Brookfield*, 287 Ga. at 411 (1); OCGA § 9-9-13 (b).[7] Unless one of the statutory grounds for vacating an award as set forth in OCGA § 9-9-13 (b) is found to exist, a trial court in reviewing an award is bound to confirm it. See *Greene*, 266 Ga. at

---

[6] See also *City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 30 (3) (743 SE2d 381) (2013) (An appellate court reviews de novo a trial court's determination of whether a contract's language is clear and unambiguous, in which case the court simply enforces the contract according to its clear terms, and, if the trial court determines that the contract is ambiguous in some material respect, the appellate court reviews de novo the trial court's application of the rules of contract construction to resolve the ambiguity, because these determinations involve questions of law.).

[7] OCGA § 9-9-13 (b) provides:

The award shall be vacated on the application of a party who either participated in the arbitration or was served with a demand for arbitration if the court finds that the rights of that party were prejudiced by:

(1) Corruption, fraud, or misconduct in procuring the award;

(2) Partiality of an arbitrator appointed as a neutral;

(3) An overstepping by the arbitrators of their authority or such imperfect execution of it that a final and definite award upon the subject matter submitted was not made;

(4) A failure to follow the procedure of this part, unless the party applying to vacate the award continued with the arbitration with notice of this failure and without objection; or

(5) The arbitrator's manifest disregard of the law.

15

596 (3). The Code expressly excludes from the grounds for vacating or refusing to confirm an award "[t]he fact that the relief was such that it could not or would not be granted by a court of law or equity[.]" OCGA § 9-9-13 (d). "An arbitrator has inherent power to fashion a remedy as long as the award draws its essence from the contract or statute." *MARTA v. Local 732, Amalgamated Transit Union*, 261 Ga. 191, 195 (2) (a) (403 SE2d 51) (1991) (citation and punctuation omitted).

An arbitrator's award may be vacated pursuant to OCGA § 9-9-13 (b) (5) "if it can be shown that the arbitrator manifestly disregarded the proper law applicable to the case before him. This disregard must be both evident and intentional." *ABCO*, 282 Ga. at 309. That is,

> [t]o manifestly disregard the law, one must be conscious of the law and deliberately ignore it. Therefore, to prove that a manifest disregard of the law has occurred, a party wishing to have an arbitration award vacated must provide evidence of record that, not only was the correct law communicated to an arbitrator, but that the arbitrator intentionally and knowingly chose to ignore that law despite the fact that it was correct.

16

Id. (citation and punctuation omitted). See also *Brookfield Country Club v. St. James-Brookfield, LLC*, 299 Ga. App. 614, 620 (3) (683 SE2d 40) (2009) ("In the arbitration context, the concept of manifest disregard has never been the equivalent of insufficiency of the evidence or a misapplication of the law to the facts." (citation and punctuation omitted)), aff'd, 287 Ga. 408 (696 SE2d 663) (2010). This showing is "an extremely difficult one to make" and requires evidence in the transcript of the arbitration proceeding (if the hearing is transcribed) or in the arbitrator's written findings (if made) or other "concrete evidence" in the record that would indicate "a specific intent" of the arbitrator to disregard the appropriate law. *ABCO*, 282 Ga. at 309-310 (citation and punctuation omitted). For example, if an arbitration award were to make "an explicit recital of the winning party's argument that the correct law should be ignored rather than followed," there would be sufficiently clear evidence on the face of the award showing the arbitrator's intent to purposefully disregard applicable law to vacate the award. Id. at 309.

On the other hand, an arbitrator who "incorrectly interprets

17

the law has not manifestly disregarded it. [The arbitrator] has simply made a legal mistake." *ABCO*, 282 Ga. at 309 (citation and punctuation omitted). "[M]ere error in law or failure on the part of the arbitrator[ ] to understand or apply the law" does not amount to deliberately disregarding the law in order to reach the result the arbitrator reached. Id. at 310 (citation and punctuation omitted). In *ABCO*, a construction contract dispute, a builder argued that the court could infer that the arbitration panel intentionally disregarded the law from the panel's ultimate award to a subcontractor, because the builder had presented the proper legal formula to calculate certain damages awarded to the subcontractor and the panel's subsequent erroneous computation could not have been a mistake or misinterpretation. See id.; *Progressive Plumbing v. ABCO Builders*, 281 Ga. App. 696 (637 SE2d 92) (2006). But an erroneous calculation of damages alone simply does not permit vacatur under OCGA § 9-9-13 (b) (5) because it is not concrete evidence of a deliberate decision not to apply the applicable standard. See *ABCO*, 282 Ga. at 309; *Progressive*, 281 Ga. App. at

18

698. Even if the reviewing court "were convinced that [it] would have decided [a] contractual dispute differently, that would not be nearly enough to set aside the [arbitrator's] award." *ABCO*, 282 Ga. at 310 (citation and punctuation omitted).

In this case, the arbitrator never expressed, during the hearing or in the arbitration award, that the correct law should be ignored rather than followed. As noted above, the Court of Appeals based its holding that the arbitrator manifestly disregarded the law on the court's determination that the arbitrator "explicitly reject[ed]" contractual language, specifically, that the Rate Card was "the contracted-for pricing" between the parties. But the arbitrator did not reject the Rate Card as establishing the wholesale cost for INDS service contracts that Dealer sold to its retail customers. Rather, the arbitrator interpreted the Rate Card in the overall context of the agreements and found that the Rate Card's sole purpose was to establish the wholesale cost for service contracts. The arbitrator "rejected" the Rate Card only to the extent INDS relied on it standing alone as contractual authority for INDS to cede to

19

Reinsurer only the actuarially determined amount for claims reserves for each service contract after first paying itself an administration fee, paying an agent's commission, deducting amounts to be held as non-claims reserves, and so on.

The arbitration award referenced applicable aspects of Georgia law of contract construction — that, where the governing contract is clear and unambiguous, the contract should be enforced according to its plain terms, and that contractual ambiguities are to be construed against the drafter. The arbitrator found that the governing contracts were vague and should be construed against the drafter, INDS. Although the contracts did not expressly provide for deductions from the Contract Cost, the arbitrator took into account that INDS deserved to be compensated for the valuable services that INDS provided to Dealer and Reinsurer. The arbitrator fashioned a remedy that he deemed just and equitable within the scope of the agreements of the parties to determine a fair compensation. Not only the arbitration clause the parties executed before the dispute arose, but also the Arbitration Agreement and the case management

orders the parties executed after the dispute arose, expressly authorized the arbitrator to fashion such a remedy. We conclude that the arbitration award draws its essence from the contracts.

However imperfect the Court of Appeals may have judged the arbitrator's understanding or application of the law to have been, such a failure by the arbitrator does not amount to concrete evidence of a deliberate decision not to apply the applicable law in making the arbitration award. See *ABCO*, 282 Ga. at 309. The cases relied upon by the Court of Appeals that were decided under OCGA § 9-9-13 (b) (5) do not support a finding of manifest disregard of the law under the circumstances of this case.[8] Because nothing in the record of the

___

[8] See *Airtab, Inc. v. Limbach Co.*, 295 Ga. App. 720, 722 (2) (a) (673 SE2d 69) (2009) (holding that the record did not show that the arbitrators deliberately ignored the subcontract or controlling law under OCGA § 9-9-13 (b) (5) and affirming the order confirming an arbitration award); *McGill Homes v. Weaver*, 278 Ga. App. 622, 623 (629 SE2d 535) (2006) (holding that the appellant's claims of manifest disregard of the law under OCGA § 9-9-13 (b) (5) were "nothing more than unreviewable factual issues" and affirming the order confirming an arbitration award (citation and punctuation omitted)). The Court of Appeals also cited cases that were decided under OCGA § 9-9-13 (b) (3), which do not support vacating the award under OCGA § 9-9-13 (b) (5). See *King v. King*, 354 Ga. App. 19, 25 (2) (b) (840 SE2d 108) (2020) (affirming the order vacating an arbitration award under OCGA § 9-9-13 (b) (3), based on prejudice to a party from the arbitrator's imperfect execution of his authority);

21

arbitration hearing or in the arbitrator's written findings of fact and conclusions of law supports a determination that the arbitrator intended to purposefully disregard applicable law, the Court of Appeals' decision to reverse the trial court's confirmation of the arbitration award under OCGA § 9-9-13 (b) (5) is reversed. See *ABCO*, 282 Ga. at 309.[9]

As noted above, the Court of Appeals did not address INDS's alternative argument under OCGA § 9-9-13 (b) (3) that the arbitrator overstepped his authority in the way he interpreted the contracts and calculated the award. Because we are reversing the

---

*Sweatt v. Intl. Dev. Corp.*, 242 Ga. App. 753, 755 (1) (531 SE2d 192) (2000) (vacating the order confirming an arbitration award under OCGA § 9-9-13 (b) (3), based on prejudice to a party from the arbitrators' overstepping of their authority).

[9] See also *Berger v. Welsh*, 326 Ga. App. 290, 295-297 (3) (756 SE2d 545) (2014) (reversing an order vacating an arbitration award for manifest disregard of the law because the evidence did not support the trial court's finding that the arbitrator announced his intention to ignore the plain and unambiguous terms of the pertinent contracts); *America's Home Place v. Cassidy*, 301 Ga. App. 233, 236 (2) (687 SE2d 254) (2009) (reversing an order denying a motion to confirm an arbitration award because the appellants did not point to any concrete evidence that the arbitrator intentionally ignored the language of the pertinent contract or applicable law); *Hansen & Hansen Enterprises v. SCSJ Enterprises*, 299 Ga. App. 469, 472 (1) (682 SE2d 652) (2009) (holding that the trial court erred in vacating an arbitration award on the basis of manifest disregard of the law because the award showed that the arbitrator knew the applicable Georgia law and applied it).

Court of Appeals' holding under OCGA § 9-9-13 (b) (5), the case is remanded for consideration of INDS's argument under OCGA § 9-9-13 (b) (3). We express no opinion on this issue.

*Case No. S21G0008*

2. Because INDS's claim of error under OCGA § 9-9-13 (b) (3) has not been decided, Dealer and Reinsurer's appeal from the trial court's failure to enforce the penalty for delayed payment of the amount awarded to them may not be moot, as the Court of Appeals held it was. Whether Dealer and Reinsurer's appeal is moot will depend on the Court of Appeals' decision on remand regarding INDS's claim of error under OCGA § 9-9-13 (b) (3). The Court of Appeals' dismissal of Dealer and Reinsurer's appeal is therefore vacated, and the case is remanded for reconsideration of that appeal.

*Judgment vacated and case remanded in Case No. S21G0008. Judgment reversed and case remanded in Case No. S21G0015. All the Justices concur.*

Decided December 14, 2021.

Certiorari to the Court of Appeals of Georgia – 356 Ga. App. 236.

*Withrow McQuade & Olsen, Jeffrey T. Holm, Lipsey, Morrison, Waller & Lipsey, Eric J. Morrison*, for appellants.

*Fox Rothschild, Kenton J. Coppage, Goldberg Segalla, Jeffrey L. Kingsley*, for appellee.

*Gilbert Harrell Sumerford & Martin, Judson H. Turner, Mark D. Johnson; Arnall Golden Gregory, Glenn P. Hendrix, Rebecca L. Kolb; Alston & Bird, Andrew J. Tuck; King & Spalding, Shelby S. Guilbert, Jr.; Miller & Martin, Shelby R. Grubbs; Douglas H. Yarn*; for appellants.

*Nelson Mullins Riley & Scarborough, Erika C. Birg; Khayat Law Firm, Robert C. Khayat, Jr.*, amici curiae (case no. S21G0015).